Curtis SHANNON, Plaintiff,

v.

NEW YORK CITY TRANSIT AUTHOR-ITY, and Manhattan and Bronx Surface Transit Operating Authority, Defendants.

No. 00 CIV 5079(RWS).

United States District Court, S.D. New York.

Feb. 25, 2002.

Thomas & Associates, New York City (Irene Donna Thomas, of Counsel), for plaintiff.

Berke–Weiss & Pechman, New York City (Louis Pechman, of Counsel), for defendants.

*OPINION*

SWEET, District Judge.

Defendants the New York City Transit Authority (the "NYCTA") and the Manhattan and Bronx Surface Transit Operating Authority ("MABSTOA") (collectively, the "Authorities"), have moved for summary judgment to dismiss the complaint of plaintiff Curtis Shannon ("Shannon") alleging disability discrimination under Rule 56, Fed.R.Civ.P. Shannon has cross-moved for summary judgment granting the relief sought in the complaint and to strike portions of the affidavit of Stephen A. Vidal, Chief Officer, Safety, Training and Performance for the NYCTA's Department of Buses. For the reasons set forth below, the motion of the Authorities to dismiss the complaint is granted; the cross-motion of Shannon is denied.

***Prior Proceedings***

Shannon timely filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") and filed this action within ninety days of the receipt of a Notice of Right to Sue, issued by the EEOC, dated June 28, 2000 and received on June 30, 2000.

This action was commenced on July 11, 2000, by the filing of a complaint on behalf of Shannon alleging that the Authorities had discriminated against him as a result of their improper conclusion that he was color blind, barring him from employment as a bus operator in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102(2) *et seq.* (2901) and New York State Human Rights Law, NYC Admin. Code § 8–107(15)(a).

Discovery proceeded, and was completed. The instant motions were heard and marked fully submitted on December 5, 2001.

*Facts*

The Authorities are public benefit corporations engaged in the business of providing public transportation to New York City, with their principal places of business in New York.

The Ishihara examination is a diagnostic test used to determine color vision abnormalities and capabilities. The examination is a series of plates, 24 in all, some of which have numbers on them, and some of which have patterns. They are in different colors. The patient is asked to identify either the number or the specific pattern. The William Lantern examination is like a traffic signal. It consists of red, green and yellow color lanterns. Individuals must identify the color of the light that is on.

In 1995, Shannon was employed by the NYCTA after taking a pre-employment examination in which he failed the Ishihara eye examination and passed the William Lantern eye examination.

During the pre-employment examination in March 1999, Shannon passed the Ishihara examination and was hired by the NYCTA, Department of Buses, on March 29, 1999 as a bus operator.

The bus operator job for NYCTA involves operating a bus carrying passengers in accordance with the New York City Transit Authority, New York State law, and New York City traffic rules and regulations. A bus operator is responsible for the safety of passengers and to protect the assigned vehicle. The buses driven by NYCTA bus operators weigh over 26,000 pounds, can seat over 40 passengers, and carry up to 70 passengers.

On or about May 15, 1999, in the regular course of Shannon's duties, he was involved in an accident when an individual in a parked car opened her car door and hit the tire of the bus Shannon was driving.

On May 17, 1999, Shannon reported to the NYCTA medical office where he submitted to a physical examination and an eye examination. During the eye examination, he failed the Ishihara examination. During the William Lantern examination, he stated that a light was "red" and immediately changed his answer to "yellow." During the eye examination, Shannon wore yellow tinted glassed which the examining doctor concluded might have caused a mistake during the examination.

Dr. Hae Sook Chung ("Dr.Chung"), a staff physician for NYCTA, concluded that the tests given to Shannon on May 17, 1999, were inconclusive. She restricted Shannon from duty for one week, with pay. He was not permitted to drive.

The next day, May 18, 1999, Shannon took the eye test again. He again failed the Ishihara examination and passed the "stop light" (William Lantern) examination. Dr. Chung made up a test to see if Shannon could recognize the colors red, green, yellow and blue. He passed the test.

Dr. Chung referred Shannon to Transit Authority ophthal-mologist Dr. Alfred J. Nadel ("Dr.Nadel") who examined him on May 24, 1999.

On June 7, 1999, Dr. Chung concluded that Shannon was medically qualified to perform work on a permanent basis for two months. On June 13 or 14, Dr. Chung received a report from Dr. Nadel and recalled Shannon and put him on restricted work, restricted from driving.

Dr. Chung took this action because Dr. Nadel's report "indicated he had a definite color deficiency and I thought it was not safe for him driving at that time"; "I thought it's not safe for him driving for himself and for passengers, for the public." Dr. Chung believed that Shannon "may not identify the traffic light correctly."

Dr. Chung put Shannon on restricted work temporarily to have a more elaborate color vision test performed, an electroretinogram ("ERG"), which was administered on July 21, 1999 by Dr. Sheila Margolis ("Dr.Margolis"), an opthamologist. An ERG measures an electric potential which occurs between the front and back portion of the eye when the eye is stimulated by lights. Depending on the pattern of lights used, the amount of illumination used and the resultant electrical response, the physician can make opinions as to the function of the rods and cones in the retina. The rods and cones in the retina are photoreceptors which perceive light or images or color and through the nerve fiber layer of the retina and the optic nerve, transmit these images to the brain. Dr. Margolis examined Shannon and administered an Ishihara examination during which Shannon missed seven out of nine plates.

Dr. Margolis' diagnosis was that Shannon suffered from a cone/rod abnormality and she stated at her deposition that Shannon has a red/green deficiency. Dr. Margolis stated that "[w]hen you say, diagnosis, you don't specify a red/green. It's understood that the person has a cone, a widespread cone and rod degeneration ... Any physician in ophthalmology would understand that." When pressed as to whether she "personally concluded" that Shannon has a "red/green/yellow color vision deficiency," Dr. Margolis replied:

To say that you have a cone/rod degeneration is already specifying that all the color vision cones are affected. So it could be red, it could be green, it could be blue, it could be yellow. All of them are affected. That's why this test is a diagnostic test. So by virtue of saying that, you are saying that all of the cones are deficient, whether it's a red, a green, a blue.

After Dr. Margolis administered the electroretinogram examination to Shannon, she concluded that:

The E.R.G. would—yes tells you that there is abnormality of his cone system which involves his red color vision, his green color vision, yes, because all of the cones are involved. [a]s compared to the normal population, Curtis Shannon has an abnormal color vision both on objective testing, E.R.G., and subjective testing on Ishihara.

Once all tests were completed, Dr. Margolis consulted with Dr. Nadel and reiterated the diagnosis that she made concerning Shannon and reviewed with Dr. Nadel the results of the testing. Dr. Margolis was concerned that Shannon would be at risk for losing more vision and more function.

In a written report dated July 12, 1999, Dr. Margolis indicated that "[i]t appears that there may be both a rod and cone dysfunction." She also stated that she "would be most interested in [Shannon's] fluorescein findings and [Shannon's] Goldmann visual fields."

Dr. Margolis' report does not specifically refer to any specific type of color deficiency but concluded that "it was clear he had a color vision deficiency," "a deficiency of his cones of his color vision" and "would fall into the category of red/green deficiency". Dr. Margolis was "sure that Mr. Shannon had a rod and cone dysfunction" at the conclusion of his ERG examination, that he had rod and cone dysfunction and "had a significant decrease in his amplitude," and that "all of the cones are abnormal across the whole retina." Dr. Margolis knows "for certain" that Shannon would have difficulty with red and green and might be confused with red and green:

that I know for certain since I did the Ishihara test that he could not pass the test because he has difficulty with red

and green. And I also know that based on his E.R.G., his overall, all his cones are affected by some degeneration or some problem, and it's not just his cones.

On August 16, 1999, Dr. Chung, based on Dr. Margolis' recommendation, referred Shannon to have the Goldmann visual field and the fluorescein examination and the results of the Goldmann visual field and the fluorescein examinations were within normal limits. The fluorescein angiogram examination has nothing to do with determining color deficiency, but is an objective test to determine if there is an abnormality in the retina. The Goldmann visual field examination likewise has nothing to do with determining whether a patient has a color deficiency, but tests for abnormalities in the retina.

On August 30, 1999, Dr. Nadel continued to recommend restricting Shannon from driving because "the electroretinography that was performed suggests some form of a rod-cone disorder which may or may not be progressive." Dr. Nadel was unaware of the requirements of Article 19A for the qualifications of bus operators or the regulations promulgated in connection with driving a bus.

Dr. Nadel testified as to Shannon:

that he has an abnormal color vision and he has about 40 to 50 percent of his normal function of the retinal receptor elements, which means that he may have a retinal disease which is progressive. As a result, I was uncomfortable in having somebody like that drive.

On September 19, 1999, Dr. Chung told Shannon that he was permanently restricted from driving. Anthony Crisci ("Crisci"), his superior, gave him the option to resign or be terminated. A union representative was present. Shannon chose to resign. Crisci and the union representative tried to figure out "what they could do

as far as Mr. Shannon's situation was concerned." Shannon does not specifically recall whether he spoke to Crisci about a non-driving NYCTA position, but he believes that he "probably did."

On September 20, 1999, Dr. Chung prepared a Medical Services Progress Report concerning Shannon. On this form she notes that she had received Dr. Nadel's additional report, which indicates that he could not make any other recommendation concerning Shannon because the electroretinography suggested some form of a rod-cone disorder. She also wrote her assessment of "color blindness with rod-cone disorder." She based her assessment of color blindness on the Ishihara examination and the rod-cone disorder on the ERG performed by Dr. Margolis.

Dr. Chung placed Shannon on permanent restriction because "he may or may not be progressively worse and he has a color problem." She did not believe, based on Dr. Nadel's report, that Shannon would not be able to see stop signs or identify the traffic light correctly.

Section 509–b of the New York Vehicle and Traffic Law provides that a person shall be qualified to operate a bus only if such person has passed the bus driver physical examination administered pursuant to regulations established by the Commissioner of the Department of Motor Vehicles.

The Regulations of the New York State Department of Motor Vehicles, 15 NYCRR § 6.10(b), provide that:

A person is physically qualified to drive a bus if he or she:

... (9)(i) has distant visual acuity of at least 20/40 (Snellen) in each eye with or without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snel-

len) in both eyes with or without corrective lenses, [field] of vision of at least 70 degrees in the horizontal meridian in each eye, *and the ability to recognize the colors of traffic signals and devices showing standard red, green and amber.*

(ii) A waiver of the vision standards of subparagraph (a) of this paragraph may be given to a bus driver, except a school bus driver, whenever such person has obtained a valid waiver of the vision standard from the Federal Highway Administration (FHWA). Such waiver shall be valid for the same period of time specified in the waiver issued by the FHWA.

(iii) The operator of a school bus subject to the regulations of the Commissioner of Education must meet all of the vision requirements as set forth in subparagraph (a) of this paragraph.

Section 1.13 of the Revised Medical Standards of NYCTA provide as follows:

Color blindness (368.59) or impaired color discrimination must be evaluated in terms of limiting an individual's ability to perform essential functions of the job. Placement should be carefully evaluated if physical abilities exceed ... O on Visual Color Discrimination.

*Rationale:* Some individuals with color blindness are able to perform certain jobs that require visual color discrimination by developing other cues. For bus operators, New York State article 19A prevents certification for red, green and amber color blindness.

After the separation of employment with NYCTA, Shannon began working as a bus driver in September 1999 for Parsons Coach, Ltd.

Dr. Nadel's reports did not state that Shannon is unable to recognize devices showing the colors red, amber or green, but Dr. Nadel determined that Shannon "had a very distinct color vision abnormality on the Ishihara test and ... has roughly 50 percent normal retinal function of his retinal receptor elements". He "has an abnormal color vision and has about 40 to 50 percent of his normal function of the retinal receptor elements," but did conclude based on Shannon's missing seven of nine plates on the Ishihara test, it "was clear he had a color vision deficiency." Margolis was "sure that Shannon had a rod and cone dysfunction" at the conclusion of the E.R.G. examination, that Shannon has rod and cone dysfunction and "had a significant decrease in his amplitude", that Shannon's ERG established that "all of the cones are abnormal across the whole retina," that "his rod function is abnormal as well as the cone function", that "we know objectively that his cone and rod system is not working normally, and that he has a diminished function of both his rod and cone system". She also concluded that Shannon had a "cone/rod degeneration" which means that he has a "red/green/yellow color deficiency." Shannon "probably would have difficulty seeing red or green and he would be confused about red and green." Margolis stated:

I know for certain since I did the Ishihara test that he could not pass the test because he has difficulty with red and green. And I also know that based on his E.R.G., his overall, all his cones are affected by some degeneration or some problem, and it's not just his cones ... As compared to the normal population, Curtis Shannon has an abnormal color vision both on objective testing, E.R.G., and subjective testing on Ishihara.

**I. *Summary Judgment is Appropriate***

■ Although some shades of opinion can be argued as to the medical opinions, there is no question but that the staff physician of the NYCTA determined that Shannon was deficient in his ability to

identify the color of traffic signals after receiving the reports of two ophthalmologists who had administered a series of diagnostic tests. Shannon's denial of this condition does not create a factual issue for trial in view of the uncontested medical findings.

There is no question concerning the controlling authorities and regulations which require that an operator of a bus have "the ability to recognize the colors of traffic signals and devices showing standard red, green and amber." (Regulations, N.Y. State Department of Motor Vehicles), 15 NYCRR § 6.10(b).

There is therefore no substantial factual dispute requiring trial.

## II. *Shannon Is Not Disabled Under the ADA*

■ The ADA defines "disability" with respect to an individual, as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Shannon does not have a physical or mental impairment that substantially limits one or more major life activities and he is not regarded as having such an impairment.

■ The Supreme Court has cautioned that "whether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Deficiencies in vision do not necessarily create a substantial limitation on the major life activity of seeing. *Diffey v. Riverside County Sheriff's Dept.*, 84 Cal. App.4th 1031, 1039, 101 Cal.Rptr.2d 353, 2000 Cal.App. LEXIS 868, at *15 (Cal. App.4th 2000), *rev. denied*, 84 Cal.App.4th 1031, 101 Cal.Rptr.2d 353 (Cal.4th 2001) ("Although Diffey's sight certainly was af-

fected by his color deficiency, his 'seeing' was not substantially limited."); *Hoppes v. Commonwealth Fish and Boat Commission*, 32 F.Supp.2d 770, 774 (M.D.Pa.1998) (concluding plaintiff is not disabled where his color blindness "does not prevent him from performing the tasks of daily life"); *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (reasoning that some effect on vision, like blindness in one eye, does not create a disability *per se* ); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (finding nearsighted twin sister pilots are not disabled).

As noted by the court in *Ferguson v. Whirlpool Corp.*, No. 99–2112, 2000 WL 1013309, *3, 2000 U.S. Dist. LEXIS 12905, at *9 (W.D. Ark. April 5, 2000), "[a]lthough the ability to *see* is a major life activity, color-distinction is only one aspect of sight." In *Ferguson,* the court held that the plaintiff's "inability to distinguish among colors is not a substantial limitation on his ability to see." *Id.*

■ Shannon has proceeded on the theory that the NYCTA "has regarded [Shannon] as possessing a substantially limiting impairment where in fact it is not so limiting", *citing Sutton* (Pltf. Memo of Law, p. 10).

The Supreme Court has explained that "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Service*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). If color blindness does not qualify as a disability under the ADA, Shannon's separation of employment because of his color blindness is insufficient to establish a "regarded as" claim.

As the Supreme Court noted in *Sutton,* standing alone, an allegation that an employer has a vision requirement in place does not establish a claim that the employer regards an individual as substantially limited in the major life activity of working. The Supreme Court reasoned as follows:

By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, just as it is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job.

*Sutton* at 490–91, 119 S.Ct. 2139.

■ Similarly, the fact that NYCTA required Shannon to undergo ophthalmological examinations by specialists does not establish Shannon's "regarded as" claim. The Second Circuit has held that requiring someone whom the employer believes is not capable to performing the tasks required for the job to submit to a physical examination does not mean that the employee was "regarded as having such an impairment" under the ADA. *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 647 (2d Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999). Similarly, in *Tice v. Centre Area Transportation Authority,* 247 F.3d 506, 515 (3d Cir.2001), the Third Circuit noted that a valid request for an independent medical exam "will never, in the absence of other evidence, be sufficient to demonstrate that an employer 'regarded' the employee as substantially limited in a major life activity." The Third Circuit reasoned as follows:

A request for such an appropriately-tailed examination only establishes that the employer harbors doubts (not certainties) with respect to an employee's ability to perform a particular job. Doubts alone do not demonstrate that the employee was held in any particular regard, and, as we have explained, inability to perform a particular job is not a disability within the meaning of the Act.

*Id.* (citation omitted).

■ Finally, the position of NYCTA bus operator is the only job from which Shannon is precluded. As Shannon has established, he is able to drive taxis, trucks, and even buses, although not a NYCTA bus. Accordingly, there is no basis to suggest that Shannon is regarded as limited in the major life activity of working. As the Supreme Court pointed out in *Murphy v. United Parcel Service,* 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999), "to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."

The same principle enunciated by the Supreme Court in *Murphy* was applied in *Stevens v. City of Vallejo,* No. 97–17176, 1998 WL 822740, 1998 U.S.App. LEXIS 29567 (9th Cir. Nov.17, 1998). There, a plaintiff who had color vision deficiencies was denied a position as a police officer. The court in *Stevens* held that even if the police department was incorrect about plaintiff's "ability to perform as a regular police officer, or based their decision on myths or stereotypes, [the police department] . . . still perceived Stevens as capable of performing other law enforcement work." *Id.* at *1, 1998 U.S. App. LEXIS

29567, *4. The same is true here, as exhibited by Dr. Chung's placement of Shannon on restricted duty to perform other jobs for NYCTA. As such, since the only job that Shannon is precluded from performing is that of a NYCTA bus operator, he cannot be regarded as limited in the major life activity of working.

### III. Shannon is Not Qualified for the Position of Bus Operator for the NYCTA

 The ADA, itself, makes clear that the term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An essential function of the position of bus operator for the NYCTA is distinguishing traffic light colors. Because of Shannon's difficulty in visual color perception, he cannot perform this essential function of the bus operator position.[1]

In determining what constitutes an essential function, the ADA gives deference to an employer's judgment:

[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

Indeed, the ADA expressly sanctions the use of medical standards, such as the color vision standard which resulted in Shannon's separation of employment:

1. It is the plaintiff in an ADA discrimination case who bears the burden of showing that he was otherwise qualified to perform the essential functions of the position sought. *Stone v.*

It may be a defense to a charge of discrimination under this Act that an alleged application of qualification standards, tests, or selection criteria that screen out to tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this title.

42 U.S.C. § 12113(a). *See also* § 12112(b)(6) (defining discriminate to include "using qualifications standards ... that screen out or tend to screen out an individual with a disability ... unless the standard ... is shown to be job-related for the position in question and is consistent with business necessity.").

The existence of a waiver program under the Regulations of the New York State Department of Motor Vehicles does not affect the validity of the NYCTA's vision standard. *See Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 571, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (explaining "it was error to read the regulations establishing the waiver program as modifying the content of the basic visual acuity standard in a way that disentitled an employer like Albertson's to insist on it"). Shannon never applied for a waiver of the Department of Motor Vehicles' vision standard, and never had a discussion with anyone at NYCTA regarding a waiver.

### IV. NYCTA has a Legitimate Business Justification for the Separation of Shannon's Employment as a Bus Operator

 NYCTA has a statutory obligation pursuant to New York State Public Au-

*City of Mount Vernon,* 118 F.3d 92, 96–7 (2d Cir.1997), *cert. denied,* 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998).

thorities Law § 1204(15) to operate the buses and subways for the "safety of the public." *New York City Transit Authority v. Transport Workers Union, Local 100*, 243 A.D.2d 567, 663 N.Y.S.2d 114 (2d Dep't 1997); *New York City Transit Authority v. Transport Workers Union, Local 100*, 220 A.D.2d 749, 633 N.Y.S.2d 81 (2d Dep't 1995). Accordingly, even if Shannon were able to establish a *prima facie* case under the ADA, the NYCTA has articulated a legitimate, non-discriminatory reason for Shannon's separation of employment as a bus operator because of deficiencies in Shannon's color vision.

NYCTA made a legitimate determination, based on the opinions of expert ophthalmologists, that Shannon should be restricted from driving a bus. Dr. Margolis' tests of Shannon established that Shannon had "poor color vision" and "rod and cone dysfunction," with a red/green color deficiency. Given this result, Dr. Nadel was "very concerned" about Shannon's color vision and advised that Shannon be restricted from Driving (Nadel, T. 17, 23–25). The reliance on these ophthalmological experts was a reasonable way for the NYCTA to help determine whether Shannon could be certified as meeting the Department of Motor Vehicles' requirement that he "recognize the colors of traffic signals and devices showing standard red, green and amber." Given the documented deficiencies in Shannon's color vision, the NYCTA's medical department could not, in good faith, certify that Shannon met this color vision requirement.

Where, as here, there is only one job in question, courts have had no problem finding that a plaintiff is not "regarded as" limited in the major life activity of working. *Foore v. City of Richmond*, 6 Fed. Appx. 148, 154, 2001 WL 285131, 2001 U.S.App. LEXIS 4532, *15–16 (4th Cir. March 23, 2001) (police officer who was

disqualified from employment because of his monocular vision was found not to be "regarded as" disabled since "[t]he position of police officer is simply too narrow of a field to be considered a 'class of jobs.'"); *Tone v. U.S. Postal Service*, No. 99–6309, 2000 U.S.App. LEXIS 31866, *6 (2d Cir. Dec. 13, 2000) (the fact that the employee with monocular vision was regarded as unqualified for employment as a tractor trailer operator does not amount to regarding him as substantially limited in the major life activity of working).

### V. *Failure to Provide a Reasonable Accommodation has not Been Established*

Although the New York State Human Rights Law, and the New York City Human Rights Law have a broader definition of disability, *Reeves v. Johnson Controls World Services*, 140 F.3d 144, 154–55 (2d Cir.1998), Shannon has failed to establish the elements of his reasonable accommodation claim.

 As for a cleaner position, the NYCTA has established that no vacant position for cleaner existed at the time of his separation of employment from NYCTA. In *Jackan v. New York State Department of Labor*, 205 F.3d 562, 566 (2d Cir. 2000), *cert. denied*, 531 U.S. 931, 121 S.Ct. 314, 148 L.Ed.2d 251 (2000), the Second Circuit held as follows:

> [I]n order to recover under the ADA or the Rehabilitation Act for a failure to reasonably accommodate by transfer, a plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been transferred.

The *Jackan* decision made clear that "an ADA plaintiff complaining of his employer's failure to provide a reasonable accommodation bears both the burden of production and the burden of persuasion on the question [of] whether a suitable vacancy

existed at the time he sought transfer." *Id.* at 567. *See also Parnahary v. United Parcel Service, Inc.,* 20 Fed.Appx. 53, 56, 2001 WL 1178803, 2001 U.S.App. LEXIS 21487, at *6 (2d Cir. Oct. 3, 2001) ("an employer need not reassign an employee if no position is vacant").

The cleaner list, in effect since 1995, has approximately 6,000 qualified individuals waiting for a cleaner vacancy. NYCTA's legitimate and non-discriminatory policy of hiring off the existing list for cleaners precludes Shannon's claim that he is entitled to reassignment to a cleaner position. As the Fourth Circuit noted earlier this year in *EEOC v. Sara Lee Corp.,* 237 F.3d 349, 353–54 (4th Cir.2001), "[v]irtually all circuits that have considered the issue have held that the ADA's reasonable accommodation standard does not require an employer to abandon a legitimate and non-discriminatory company policy." *Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 679 (7th Cir.1998) ("[W]e have been unable to find a single ADA or Rehabilitation Act case in which an employer has been required to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer.").

▬ As the Honorable Shira A. Scheindlin recently noted, reclassifications which require an "exception" or "preference" are not mandated by the ADA. *Felix v. New York City Transit Authority,* 154 F.Supp.2d 640, 659 (S.D.N.Y.2001) (finding that reclassification was not a reasonable accommodation where reclassification from Railroad Clerk to Clerical Associate would have violated nondiscriminatory policy prohibiting such transfers).

Although the record has mention of a number of job titles, Shannon has not established any facts with respect to the availability of any other reasonable accommodation by way of employment under any other title.

### The Motion to Strike the Vidal Affidavit is Denied

▬ Stephen A. Vidal ("Vidal") submitted an affidavit in support of the NYCTA's motion to establish the requirements for a bus operator and the availability of a cleaner position at the NYCTA. Shannon has sought to strike the affidavit as hearsay and incompetent.

Vidal is the Chief Officer, Safety, Training and Performance for the New York City Transit Authority Department of Buses. His responsibilities include the oversight of all probationary hourly and supervisory employees for the transportation and maintenance departments of the Department of Buses and from 1995 through 1999, he was responsible for the development and execution of Department of Buses' hourly and supervisory hiring plan and implementation of its hiring policies. He served as the chief contact person with the unions and/or NYCTA's medical department on reassignment policy matters.

▬ Vidal's affidavit is based on personal knowledge. *Svenska v. Harris Corp.,* 3 F.3d 576, 581 (2d Cir.1993). As the Honorable William C. Conner recently noted, "[t]he test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *State of New York v. St. Francis Hospital,* 94 F.Supp.2d 423, 425 (S.D.N.Y. 2000).

The scope and depth of Vidal's position at the NYCTA and his commensurate knowledge is distinct from the "low level employee" in *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954, 962 (4th Cir.1996) cited by Shannon. The Vidal affidavit did not contain "summaries of evidence" or "resemble an adversarial

memorandum" as was the case in *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.1999). The motion to strike is denied.

It is so ordered.