Terrance BURTON, Plaintiff,

v.

**METROPOLITAN TRANSPORTATION AUTHORITY and New York City Transit Authority, Defendants.**

**No. 01 CIV. 72(DC).**

United States District Court,
S.D. New York.

Feb. 12, 2003.

Somma, Zabell & Associates, LLP, By Saul D. Zabell, Esq., Michael J. D'Angelo, Esq., Farmingdale, for Plaintiff.

Hoguet Newman & Regal, LLP, By Dorothea W. Regal, Esq., Kathleen L. Lowden, Esq., J. Cullen Howe, Esq., New York, for Defendants.

## OPINION

CHIN, District Judge.

In this employment case, plaintiff Terrance Burton claims that the Metropolitan Transportation Authority (the "MTA") and the New York City Transit Authority ("NYCTA") discriminated against him by terminating his probationary employment as a bus driver in violation of city, state, and federal disability discrimination laws.

Primarily, Burton contends that the defendants wrongly perceived him as being disabled because he underwent heart valve surgery and began a life-long anticoagulant regimen using the medication Coumadin. For the reasons that follow, defendants' motion for summary judgment is granted.

## BACKGROUND

### A. *Facts*

Construed in the light most favorable to plaintiff, the facts are as follows:

Burton was hired as a bus operator with NYCTA and began a one-year probationary period on March 29, 1999. (Burton Dep. at 11–14, 33–34, 57, 61–63). In September 1999, Burton informed his union that he needed aortic valve replacement surgery. By letter dated September 7, 1999, the union informed Burton's supervisors that he would be taking a medical leave beginning on September 24, 1999, for two to four months, to have heart valve surgery. In light of Burton's condition, his supervisors sent Burton to the NYCTA Medical Assessment Center (the "MAC") to determine if he was still qualified to operate a bus. (De Vito Aff. ¶ 5). Burton reported to the MAC on September 8, 1999, where staff physician Dr. Hae Sook Chung placed him on temporary restricted duty, prohibiting him from driving any NYCTA vehicle. (Davis Aff. Ex. 1; Burton Dep. at 114–17). Burton began his medical leave on September 9, 1999. On October 5, 1999, Burton had a mechanical heart valve implanted, and began to take the anticoagulant medication Coumadin (generically, Warfarin). Burton must take Coumadin for the rest of his life. (Burton Dep. at 99–100, 132).

Burton reported back to work on January 10, 2000, where he was examined by Deputy Medical Director Dr. Alan Genser.

To Burton's surprise, Genser determined that because Burton was taking Coumadin, he was no longer medically qualified to drive a bus. Genser placed him on permanent restricted duty status, preventing Burton from driving any NYCTA vehicle. (Burton Dep. at 138).

New York state motor vehicle regulations provide that, to be physically qualified to drive a bus, a person must have no "injury or illness which may interfere with the ability of such driver to operate or control a bus safely" and "no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." N.Y. Comp.Codes R. & Regs. tit. 15, § 6.10(b)(3); *see also* 49 C.F.R. § 391.41(b)(4) (same federal standard for drivers of commercial vehicles); N.Y. Veh. & Traf. Law § 509-a et seq. NYCTA Medical Standards provide that valvular heart disease is not acceptable in light of the working conditions of a bus operator, specifically because of exposure to temperature extremes and combative people. (*See* Alexander Aff. Exs. 2, 5, 9). Further, the working conditions exceed acceptable thresholds for those on anticoagulation therapy because of exposure to moving objects, bodily injury, slippery surfaces, and violent or combative people. (*See* Alexander Aff. ¶ 20).

Burton's employment was terminated on February 2, 2000. (De Vito Aff. Ex. 5; Burton Dep. at 164). At the time, there were no restricted duty positions available, and as a probationary employee, Burton was not eligible for reclassification. (*See* Davis Aff. ¶¶ 6, 9; Gorman Aff. ¶ 14, Ex. 1). Burton began working part-time in March 2000 at high-end shoe stores in New Jersey; in May 2000, he was em-

ployed as a store manager at Bruno Magli. (Burton Dep. at 207–10).

## B. *Procedural History*

Burton filed a timely complaint with the EEOC, which issued a Notice of Right to Sue on October 31, 2000. Burton commenced this action on January 4, 2001, alleging that the MTA and NYCTA violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"), the New York State Human Rights Law, Executive Law § 290 et seq. (the "NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code Title VIII (the "NYCHRL"). He also asserted a retaliation claim. The complaint alleged both federal question and diversity jurisdiction. The parties engaged in discovery, and this motion followed.

## DISCUSSION

### A. *Applicable Law*

#### 1. *Jurisdiction*

At the outset, the Court notes that it has diversity jurisdiction, not simply supplemental jurisdiction, over Burton's state law claims. *Cf. Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir.2001) ("We think that in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York."). Thus, I will consider Burton's claims under the ADA, the NYSHRL, and the NYCHRL.

#### 2. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see also Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party; and it is material if it can affect the outcome of the action based on the governing law. *See Anderson*, 477 U.S. at 248–50, 106 S.Ct. 2505.

To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *see also Gonzalez v. Rite Aid of N.Y., Inc.*, 199 F.Supp.2d 122, 129 (S.D.N.Y.2002). Rather, the nonmoving party must present significant probative evidence tending to support the complaint. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). There is no issue for trial unless there exists sufficient evidence favoring the nonmoving party to support a jury verdict for that party. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

#### 3. *The ADA*

The ADA prohibits discrimination against any "qualified individual with a

disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Buckley v. Consol. Edison Co.*, 155 F.3d 150, 153–54 (2d Cir.1998). As the Seventh Circuit has noted, "Congress enacted the ADA to 'level the playing field' for disabled people. Congress perceived that employers were basing employment decisions on unfounded stereotypes." *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995).

■ The ADA defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; ... or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). To survive this motion for summary judgment, Burton therefore must present sufficient evidence from which a jury could find that: (1) defendants are covered by the ADA; (2) he suffers from a disability—or is regarded as suffering from one—within the meaning of the ADA; (3) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *See Giordano*, 274 F.3d at 747 (citations omitted).

■ Here, defendants contend that Burton cannot show the second and third elements, as he is neither disabled within the meaning of the ADA, nor is he qualified to perform the essential functions of his job. Burton contends that he is not disabled (Burton Dep. at 14–15), but argues that defendants wrongly perceived him to be, thus bringing him within the protection of the ADA. *See* 42 U.S.C. § 12102(2)(C) (defining disability as "being regarded as hav-

ing such an impairment"). "Under 42 U.S.C. § 12102(2)(C) ('regarded as disabled'), the decisive issue is the employer's perception of his or her employee's alleged impairment." *Giordano*, 274 F.3d at 748.

### 4. *The NYSHRL*

For the most part, the ADA and the NYSHRL are construed similarly, and the clear legislative purpose in drafting the NYSHRL was "to enact a definition of disability coextensive with comparable federal statutes." *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 155 (2d Cir.1998). The NYSHRL substantially resembles the ADA, providing in pertinent part:

> It shall be an unlawful discriminatory practice: (a) For an employer ..., because of the ... disability ... of any individual ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment.

N.Y. Exec. Law § 296; *see Mohamed v. Marriott Intern., Inc.*, 905 F.Supp. 141, 156 (S.D.N.Y.1995). "Disability" is defined as:

> (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or ... (c) a condition regarded by others as such an impairment, *provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.*

N.Y. Exec. Law § 292(21) (emphasis added).

■ Despite this similarity, it is well-settled that the NYSHRL definition of disability is broader than the federal definition. *Reeves,* 140 F.3d at 155; *see State Div. of Human Rights v. Xerox Corp.,* 65 N.Y.2d 213, 218–19, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985); *Anyan v. N.Y. Life Ins. Co.,* 192 F.Supp.2d 228, 245 (S.D.N.Y. 2002). Importantly, " 'an individual can be disabled under the [NYSHRL] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities.' " *Reeves,* 140 F.3d at 155 (quoting *Hazeldine v. Beverage Media, Ltd.,* 954 F.Supp. 697, 706 (S.D.N.Y.1997)).

■ Although contained in the definition section, the NYSHRL proviso that a person must be able to perform job duties in a "reasonable manner" with "reasonable accommodation" is the equivalent of the third element of an ADA claim. *See* 42 U.S.C. 12111(8) (defining "qualified individual with a disability"). That is, the NYSHRL requires the same inquiry into whether the plaintiff was qualified to perform the essential functions of his job, with or without reasonable accommodation. *See, e.g., Brennan v. New York Police Dep't,* 1997 WL 811543, at *6–7 (S.D.N.Y. 1997).

### 5. *The NYCHRL*

■ The NYCHRL is also substantively similar to the NYSHRL and the ADA. *See Mohamed,* 905 F.Supp. at 156. The NYCHRL defines disability to include "any physical, medical, mental or psychological impairment." NYC Admin. Code § 8–102(16). The NYCHRL should be interpreted in accord with state, not federal law; as in the NYSHRL, there is no requirement that the impairment "substan-

tially limit" the person in some major life activity, and thus the requirement is broader than the ADA. *See Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 233 (2d Cir.2000).

The NYCHRL provides, however, for an affirmative defense roughly equivalent to the ADA and NYSHRL "essential functions" test. *See Sweet v. Elec. Data Sys., Inc.,* 1996 WL 204471, at *10 (S.D.N.Y. 1996). The defense precludes recovery if the plaintiff "could not, with reasonable accommodation, satisfy the essential requisites of the job." N.Y.C. Admin. Code § 8–107(15)(b).

### B. *Application*

#### 1. *Burton Is Not Disabled Under the ADA*

■ Although NYCTA found Burton to be disqualified for the particular job of bus driver, Burton is not disabled. The Second Circuit addressed the precise issue at stake here in *Giordano v. City of New York,* 274 F.3d 740 (2d Cir.2001). There, the court held that a police officer required to take Coumadin after heart valve surgery was not "regarded as disabled" when the city terminated his employment. The court reasoned that plaintiff "must show not only that the defendants 'regarded [him] as somehow disabled,' but that they 'regarded [him] as disabled within the meaning of the ADA.' " *Id.* at 748 (quoting *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998)). Even though Giordano was discharged because he was regarded as unable to work as a city police officer, the court found that at most he was regarded as unable to work in police or investigative or security positions that involved substantial risk of physical confrontation.

Like Giordano, Burton must establish that the defendants perceived him as sub-

stantially limited in his ability to perform a major life activity—in this case, "working," not just that the defendants perceived that he was unable to work as a bus driver. *See* 29 C.F.R. §§ 1630.2(i), 1630.2(j)(3) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); *see Shannon v. New York City Transit Auth.,* 189 F.Supp.2d 55, 63 (S.D.N.Y.2002) (finding color blind bus driver not regarded as disabled under ADA and noting "the position of NYCTA bus operator is the only job from which Shannon is precluded").

Here, Burton is not disabled for purposes of the ADA, and it is evident that he works in other jobs, including retail. (Pl. Opp. at 6; Burton Dep. at 15, 225, 251). He is not foreclosed from a broad class of positions, and he has presented no evidence that the defendants regarded him to be. *See Giordano,* 274 F.3d at 749 ("The decisive issue, then, is whether Giordano introduced evidence to support the allegation that the defendants regarded him as disqualified not only from full-duty patrol as an NYPD police officer but from 'working.' ").

■ In response, Burton argues that the MAC had an "unwritten policy of not allowing individuals who take Coumadin to operate a bus." (Pl. R. 56.1 Statement ¶ 5). Even assuming such a policy existed, however, this is not a sufficient basis for an ADA claim. Indeed, Burton's sole basis for his contention that NYCTA perceived him as disabled was that it fired him. (Burton Dep. at 252). It is not enough, as the Second Circuit noted re-cently, for the plaintiff to "demonstrate[ ] only that [defendants] refused to hire certain applicants according to its own hiring criteria; . . . a finding of perceived disability may not rest merely on a single employer's failure to hire a candidate." *EEOC v. J.B. Hunt Transp., Inc.,* 321 F.3d 69, 77 (2d Cir.2003).

■ In addition, Burton argues that the single position of bus operator was actually a "wide range of positions," as NYCTA created, through collective bargaining, a handful of restricted duty positions for bus operators, including moving empty buses, mail delivery, and cleaning. Burton produced no evidence, however, to suggest that NYCTA perceived him as unable to perform these jobs, which were filled, under the collective bargaining agreement, on the basis of seniority. (Davis Aff. ¶¶ 5–7). *See J.B. Hunt Transp., Inc.,* 321 F.3d at 76 ("The fact that Hunt did not have another, less demanding driving position to offer the candidates does not indicate that Hunt perceived the candidates as being unqualified for any driving position at all.") (citing *Baulos v. Roadway Express Inc.,* 139 F.3d 1147, 1154 n. 7 (7th Cir.1998) ("[T]he ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees.")); *see also U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 122 S.Ct. 1516, 1525 (2002) (noting that "[w]e can find nothing in the [ADA] that suggests Congress intended to undermine seniority systems").

Burton does not dispute that defendants actually had no restricted duty positions available at the time, contending that the union was negotiating for additional positions, in part to assist Burton. (*See* Pl. R. 56.1 Statement ¶¶ 34–35; Def. R. 56.1 Statement ¶¶ 34–38). This is not evidence that NYCTA regarded him as broadly dis-

abled; nor is the MAC recommendation restricting him from driving *any* NYCTA vehicle.[1] It is clear that Burton was fired because he could not complete his probationary period, as he could not meet the applicable standards of a bus operator while taking Coumadin.

### 2. NYCTA Did Not Retaliate Against Burton

■ Burton's claim of retaliation is denied because Burton did not pursue a complaint of discrimination while employed by NYCTA, and did not even mail his complaint to the EEOC or management until after he was discharged. (Burton Dep. at 198–207). *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000). Nor does Burton raise any question of fact that his discharge was causally connected to an earlier union grievance regarding the NYCTA restrictive duty policy. The union negotiations—which referred to Burton as someone in need of a restricted duty position—resulted in an increase in the number of restricted duty positions. Further, the negotiations were initiated *after* Burton was placed on restrictive duty. (Alexander Aff. Ex. 4; Davis Aff. Ex. 4). Thus, Burton cannot show any retaliation.

### 3. Burton Is Not Qualified To Be a Bus Operator, and Thus Cannot Recover Under the NYSHRL or the NYCHRL

■ As discussed above, to be protected by either the ADA, the NYSHRL or the NYCHRL, Burton must be qualified to perform the essential functions of the bus operator position. Because he must take Coumadin, in light of the responsibilities of that position, I conclude that he is not qualified.

There is no question that Coumadin does not affect Burton's raw physical ability to drive a bus—he is physically able to drive a bus. (Alexander Aff ¶ 18). The questions are whether he can do so safely and whether NYCTA's judgment that he cannot amounts to discrimination.

### a. The Effects of Anticoagulation Therapy

Burton does not quarrel with defendants' evidence generally describing his condition. This evidence shows that a mechanical heart valve presents a risk of thrombosis, or blood clots, which can cause strokes. (Alexander Aff. ¶ 15). To counter this risk, a closely monitored regimen of anticoagulant is prescribed. The therapy itself presents risks of internal hemorrhage, which some studies have reported ranging as high as 7 percent for those, like plaintiff, with a mechanical heart valve treated with anticoagulants, as well as a secondary risk of hemorrhage ranging from 1 to 4 percent. (Alexander Aff. ¶¶ 16–17). Thus, both Burton's underlying condition and the therapy it requires create a risk of hemorrhage, either from spontaneous "internal bleeds" or as a response to external cuts or bruises.

---

**1.** It is true that NYCTA physicians, both before and after the surgery, restricted Burton from driving *any* NYCTA vehicle, not just those in passenger service. This distinction, although not properly addressed by defendants, does not persuade me that NYCTA regarded Burton as broadly disabled. It is obvious that the essential function of the bus operator position is to drive a bus in passen-

ger service, and thus the MAC assessments are of limited relevance. Even if I were to assume that NYCTA perceived Burton as unable to drive *any* vehicle safely, and if I were to assume that this constituted a broad class of jobs, as I discuss below, Burton is not qualified to perform the essential functions of the bus operator position, and thus cannot avoid summary judgment.

### b. The Duties of the Bus Operator Position and NYCTA Medical Standards

Burton does not dispute that due to the risk of stroke or catastrophic hemorrhage, NYCTA cannot certify him, pursuant to Article 19–A of the New York Vehicle and Traffic Law, to be free from any condition that affects his ability to drive a bus safely. *See* N.Y. Veh. & Traf. Law §§ 509–b, 509–e. Specifically, Burton cannot meet the state law qualification that he be free from any "current diagnosis of . . . coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by . . . collapse." N.Y. Comp.Codes R. & Regs. tit. 15, § 6.10(b)(3). In addition to this broad requirement of state law, Burton does not dispute that specific NYCTA Medical Standards, when applied to the requirements of the bus operator position, also disqualify him.

NYCTA Medical Standards were developed by the Occupational and Industrial Orthopedic Center of the New York Hospital for Joint Diseases and NYCTA staff in its Occupational Health Services Division. (Alexander Aff. ¶ 5). *Cf. J.B. Hunt Transp., Inc.*, 321 F.3d at 78–79 ("Based upon a list of drugs and their potential side effects compiled by David Whiteside, a Hunt employee with no medical training, and a Medical Guidelines policy developed by Michael Gray, a former Red Lobster cashier with no medical training who was, nevertheless, Hunt's Medical Advisor, Hunt determined that certain applicants were unfit to be truck drivers.") (Sotomayor, J., dissenting). The standards define acceptable working conditions, including types of exposure and their frequency, for employees with specific medical problems. For those on anticoagulant therapy, the standards indicate that the "therapy medi-

cally induces a bleeding disorder to protect the patient from uncontrolled thrombosis," and indicates that "[l]imitations may include protection from bodily injuries, slips and falls, the environment, and combative persons." (Alexander Aff. Ex. 9). Standard 8.1 provides that therapeutic anticoagulation is "acceptable for most positions if working conditions do not exceed" certain exposures, in degree and frequency. Standard 8.1 sets out specific rates for moving objects, bodily injury, slippery surfaces, and violent, assaultive, or combative persons. (*Id.*). The standard includes a "rationale," that "relatively minor trauma can provoke bleeding for patients on oral anticoagulation." (*Id.*).

There is no dispute that the working conditions of the bus operator position exceed these thresholds. The position is described in its job profile as "entail[ing] frequent interactions with passengers." (Alexander Aff. Ex. 2). The work conditions attached to the profile describe the potential for "monthly" bodily injury, such as "severe cuts, broken bones;" and exposure throughout the work day to "moving objects" where "extraordinary safety [is] required," as well as day-long exposure to "combative persons." (*Id.*). These exposures are quantified, and they exceed the standards NYCTA adopted for those on anticoagulation therapy.

### c. Burton Does Not Seriously Dispute Defendants' Evidence

Burton does not seriously contest defendants' evidence about his condition, nor the overall soundness of the NYCTA Medical Standards. Burton offers no evidence of his own about the risks or lack of risks associated with Coumadin, nor does he dispute the requirements of the bus driver position. Instead, Burton's opposition rests entirely on the suggestion that NYCTA currently employs other bus drivers

with other health risks, and that plaintiff "is at no greater risk than for stroke, liver disease, internal bleeding, embolic phenomenon, syncope or hypertension than someone who: is an African American; aging; a smoker; has other heart diseases; has hemophilia or other circulatory diseases; and are overweight and live sedentary lifestyles." (Pl. R. 56.1 Statement ¶ 43). As support for this proposition, plaintiff relies upon testimony from one of the defendants' fact witnesses, Dr. Hae Sook Chung.

In fact, Burton mischaracterizes Dr. Chung's testimony. Dr. Chung, responding to questions from Burton's counsel, does not quantify these other risk factors, and in any event she concludes that Burton "definitely ... has a higher risk." (Chung Tr. 34). Moreover, Burton does not contest defendants' other evidence that distinguishes latent "risk factors," associated with lifestyle, for instance, from the very different set of side effects stemming from high-intensity anticoagulation therapy. (Alexander Aff. ¶ 19).

### d. The Risks Posed by a Bus Operator on Coumadin Are Unacceptable

It is self-evident that the bus operator position is extremely safety-sensitive. Indeed, NYCTA has a statutory duty to operate buses for the "safety of the public." N.Y. Pub. Auth. Law § 1204(15); see Shannon, 189 F.Supp.2d at 65. A NYCTA bus weighs 16.5 tons and carries up to 57 passengers. (De Vito Aff ¶ 2). See J.B. Hunt Transp., Inc., 321 F.3d at 76 ("The evidence suggests that Hunt found the applicants unsuited for long-distance driving of Hunt's 40–ton trucks on irregular, stressful schedules, but does not indicate that Hunt perceived the applicants as more broadly limited."). The Court need not cite to the record to observe that there

is probably no more challenging place to drive a bus—without injury to self or others—than New York City.

In part, NYCTA regulations are directed to the safety of the driver. It is due to the risk of serious injury to the driver taking Coumadin that the likelihood of relatively minor events—slips and falls, combative passengers—becomes unacceptable. The plaintiff does not dispute this evidence, nor does he dispute the indirect risk to the public that the working conditions of a bus driver pose, that is, that a minor bodily injury to a driver taking Coumadin could fast become an unreasonable risk to the public. This indirect risk, coupled with the additional, more obvious risk that a bus operator taking Coumadin could suffer a stroke (a risk that is also present if not sufficiently anticoagulated) or spontaneous internal hemorrhage, is unacceptable, and therefore appropriately disqualifying. Indeed, it is easy to imagine the massive liability NYCTA would incur if any one of these risks materialized. See Daugherty v. City of El Paso, 56 F.3d 695, 698 (5th Cir.1995) ("Woe unto the employer who put such an employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident.") (citations omitted).

In some respects, this case is a closer question than Giordano, because a bus driver faces less risk of substantial physical confrontation than a police officer. The problem is that, though there may be less risk of such a confrontation, the stakes are that much higher for the driver of a 16.5 ton vehicle wending its way through crowded New York City streets. Cf. Gasser v. Ramsey, 125 F.Supp.2d 1, 5 (D.D.C. 2000) ("Defendant [on a Rule 12(c) motion] has failed to show that the kind of trauma a police officer routinely encounters (especially one who works in a business district which entails little combat action, as was

the case with Plaintiff [who takes Coumadin] prior to his transfer) is significantly different from the kind of trauma that large numbers of employees face in the course of different lines of employment.").

In the bus driving context, a relatively small risk is unreasonable and unacceptable, and the NYCTA standards that mandate this result do not violate city, state or federal anti-discrimination law. *See Pickering v. City of Atlanta,* 75 F.Supp.2d 1374, 1378 (N.D.Ga.1999) (reasoning that "even if the risk that a corrections officer will be exposed to physical trauma is minimal, it may still be an essential part of the job" and thus corrections officer taking Coumadin was unable to perform essential functions), *aff'd,* 235 F.3d 1344 (11th Cir. 2000). Moreover, while leaving defendants' evidence completely uncontroverted, Burton presents no additional evidence to create a genuine issue of material fact on this issue. Thus, from the evidence in the record, there is virtually no question that Burton cannot perform the duties of a bus driver without posing grave risks, direct and indirect, to himself and others.

 Under state law, the standard is that "the particular disability must be such that it prevents the particular individual from performing in a reasonable manner the particular activities involved in the job or occupation before an employer is permitted to terminate the individual employee," *Antonsen v. Ward,* 77 N.Y.2d 506, 513, 569 N.Y.S.2d 328, 571 N.E.2d 636 (1991) (internal quotation marks omitted), and here defendants have satisfied it. This is because, under the NYSHRL definition, "if a person cannot perform the duties of his or her job upon the provision by the employer of a reasonable accommodation, the person is not 'disabled'" in the technical sense of the statute. *Gronne v. Apple Bank for Sav.,* 2000 WL 298914, at

\*9 (E.D.N.Y.2000), *aff'd,* 1 Fed.Appx. 64 (2d Cir.2001).

Under New York City law, although for the purposes of this motion I assume that Burton is disabled, I conclude that NYC-TA has established the affirmative defense that Burton cannot satisfy the requirements of the position, with or without reasonable accommodation.

### CONCLUSION

For the reasons set forth above, defendants' summary judgment motion is granted, and all of Burton's claims are therefore dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.