Southern District of New York is RE-VERSED. The parties are to bear their own costs.

Curtis SHANNON, Plaintiff–Appellant,

v.

NEW YORK CITY TRANSIT AUTHOR-ITY, a Public Benefit Corporation and the Manhattan and Bronx Surface Transit Operating Authority, a Public Benefit Corporation, Defendants–Appellees.

Docket No. 02–7266.

United States Court of Appeals, Second Circuit.

Argued: Oct. 30, 2002.

Decided: June 13, 2003.

Irene Donna Thomas, Thomas & Associates, New York, NY, for Plaintiff–Appellant.

Louis Pechman, Berke–Weiss & Pechman LLP, New York, NY, for Defendants–Appellees.

Before: JACOBS and SACK, Circuit Judges, and TRAGER, District Judge.*

JACOBS, Circuit Judge.

Plaintiff Curtis Shannon, who worked as a bus driver, was found to be color-blind and asked to resign his position in lieu of termination. Shannon contends that he was constructively fired on the basis of a "regarded as" disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and of state and local disability discrimination laws. The United States District Court for the Southern District of New York (Sweet, J.) granted summary judgment to defendants New York City Transit Authority and the Manhattan and Bronx Surface Transit Operating Authority (collectively "NYCTA") and dismissed Shannon's claims.

On appeal, Shannon argues that the district court erred in ruling that he failed to establish that he was "otherwise qualified" to perform the essential functions of his job as a NYCTA bus driver, with or without reasonable accommodation. We affirm the district court's ruling in this regard, and in doing so reject Shannon's arguments that: (1) defendants failed to present sufficient evidence to establish that he could not distinguish the colors of traffic lights; (2) distinguishing these colors is not an essential function of the job of a NYCTA bus driver; and (3) his state-law claims survive even if his federal claims fail.

## BACKGROUND

Defendants are public benefit corporations that provide mass transit, including bus service, to the people of New York City. Plaintiff Curtis Shannon was hired by NYCTA in March 1999 after a pre-employment exam in which a doctor certified that he was qualified to drive a NYCTA bus. The exam included an "Ishihara" color vision test, in which Shannon had to distinguish various colors by recognizing patterns on a series of colored plates.

Shannon worked as a NYCTA bus driver for approximately six weeks before his bus was in a minor traffic accident on May 15, 1999. According to Shannon, the opening door of a parked car hit the tire of his bus. After the accident, Shannon was subjected to a post-accident medical examination—as required under NYCTA rules—and this time he failed the Ishihara color differentiation test. In a second color vision test, a "Williams' Lantern" test, he was asked to identify specifically the colors of traffic signals—red, green, and yellow (or amber)—from flashing lights, and wrongly identified a yellow light as "red." Although he immediately changed his answer to "yellow," and explained that he had blurted out "red" by mistake, the NYCTA staff physician who administered the test—Dr. Hae Sook Chung—considered the test results "inconclusive," and restricted Shannon from driving for one week pending further testing.

---

* The Honorable David G. Trager, District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

Because the inconclusive result on the Williams' Lantern test may have been affected by Shannon's yellow-tinted glasses, he was re-tested the next day without them, and passed. Dr. Chung tentatively recertified Shannon as qualified to drive a NYCTA bus, but referred him to an outside medical consultant for further testing.

On May 24, 1999, Shannon saw Dr. Alfred Nadel, an experienced ophthalmologist, who administered an expanded Ishihara test. Shannon could identify only two out of twenty-four color plates. Dr. Nadel reported back to Dr. Chung:

In general, Mr. Shannon seems to have a definite deficit in color perception. To evaluate the extent of his color blindness and the axis that is most affected, I suggest that more elaborate color vision testing be performed.

Dr. Chung restricted Shannon from driving pending the more elaborate tests recommended by Dr. Nadel.

On June 4 and July 21, Shannon was examined by Dr. Sheila Margolis, another ophthalmologist, who administered another Ishihara test. This time, Shannon correctly identified two out of nine color plates. Dr. Margolis also administered a Electroretinogram ("ERG") test, which checks cellular elements of the retina—called rods and cones—that can affect color vision. Dr. Margolis concluded that Shannon might have dysfunction in his rods and cones, and so reported to Dr. Nadel, who passed this diagnosis on to Dr. Chung on August 5, stating that "[i]n view of this finding with the associated color deficiency, it [was] advisable that Mr. Shannon be restricted from driving." After some additional testing, Dr. Nadel wrote to Dr. Chung on August 30: "I cannot make any other recommendation regarding Mr. Shannon's case."

On September 19, 1999, Dr. Chung reviewed with Shannon the opinions of Drs. Nadel and Margolis, and told Shannon that he could no longer drive a NYCTA bus. The next day, she recorded her final assessment: "color blindness with rod-cone disorder."

Between the initial driving restriction in mid-June and the permanent one on September 19, Shannon had been working for NYCTA in the non-driving position of "cleaner." However, no permanent position as a cleaner was available: 6,000 applicants were on the waiting list. After the September 19 meeting with Dr. Chung, Shannon met with his supervisor and a union representative, told them Dr. Chung's conclusion, and (though Shannon suggests that he "probably" discussed reassignment) Shannon's supervisor told him to resign or be terminated. Shannon resigned.

After resigning, Shannon filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Notice of Right to Sue, and Shannon filed this suit. Following discovery, the parties filed cross motions for summary judgment, and the district court denied Shannon's motion and granted defendants' motion. *See Shannon v. New York City Transit Auth.*, 189 F.Supp.2d 55, 64 (S.D.N.Y.2002). The court entered judgment for the defendants, and Shannon appealed.

## DISCUSSION

Summary judgment is appropriate only where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). We review a district court's decision granting summary judgment *de novo*, viewing all evidence in the light most favorable to the non-moving party. *Adjustrite Sys. v. Gab Bus. Servs.*,

145 F.3d 543, 547 (2d Cir.1998). Nevertheless, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

## I

■ Under the ADA, Shannon undertakes the initial burden of establishing a *prima facie* case of disability discrimination. *Heyman v. Queens Village Comm. for Mental Health,* 198 F.3d 68, 72 (2d Cir.1999). To make out a *prima facie* case, Shannon must show that (1) NYCTA is subject to the ADA; (2) he was a person with a disability within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability. *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998). In this appeal, NYCTA does not contest the first and fourth elements of Shannon's *prima facie* case.

As to the second element, Shannon does not contend that he was actually disabled, i.e., that he had a physical or mental impairment that substantially limited one or more of his major life activities, *see* 42 U.S.C. § 12102(2)(A); he denies that he was (or is) color blind, and in any event does not argue that color blindness by itself would amount to a disability under the ADA. The ADA, however, also prohibits discrimination against persons "regarded as" disabled, *see id.* § 12102(2)(C), on the premise that "society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment," *see Sch. Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

Shannon alleges that NYCTA regarded him as being substantially limited in the major life activity of seeing.[1] This is a stretch, but we accept this assertion (*arguendo*) and decide this appeal on the alternative ground that Shannon has failed to establish another element of his *prima facie* case, that he was "otherwise qualified."

## II

■ "Although the phrase 'otherwise qualified' is hardly unambiguous on its face, its meaning in the context of an employment discrimination claim is fairly clear: an individual is otherwise qualified for a job if she is able to perform the essential functions of that job, either with

---

1. Shannon does not contend that color blindness substantially limits any major life activity, and there appears to be no evidence that defendants regarded him as having an impairment other than color blindness. *See Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 646 (2d Cir.1998) (stating that to make required showing "that the employer regarded the individual as disabled *within the meaning of the ADA,*" plaintiffs had to show that defendants regarded plaintiff as "having *an impairment* that substantially limited a major life activity" (second emphasis added)). In arguing that the NYCTA regarded him as disabled, Shannon points out that NYCTA and its consultant doctors did not limit the vision testing they performed to *color* testing; it is an open question, however, whether an employer's testing of a particular capacity can alone support an inference that the employee is regarded as suffering from a deficit in the capacity tested. *See Tice v. Ctr. Area Transp. Auth.,* 247 F.3d 506, 508–09 (3d Cir.2001) (holding that medical tests alone are insufficient proof that an employer regarded an employee as disabled).

or without a reasonable accommodation." *Borkowski v. Valley Central Sch. Dist.,* 63 F.3d 131, 135 (2d Cir.1995) (citing *Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). "Essential functions" are defined under EEOC regulations to mean the " 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.' " *Stone v. City of Mount Vernon,* 118 F.3d 92, 97 (2d Cir.1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)). In approaching this inquiry, "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of New York,* 132 F.3d 145, 151 (2d Cir.1998) (citing *Doe v. New York Univ.,* 666 F.2d 761, 776 (2d Cir.1981)). A reasonable accommodation can never involve the elimination of an essential function of a job. *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991).

The district court held that Shannon lacks the ability to distinguish the colors of traffic signals, and that this ability is an essential function of being a NYCTA bus driver. *See Shannon,* 189 F.Supp.2d at 64. Shannon contends that this was error because there was insufficient evidence that he was unable to distinguish traffic light colors, and in any event points to a waiver program under state law that might allow a person with that deficit to drive a bus. According to Shannon, questions as to his ability to distinguish traffic light colors, and the possibility of a waiver even if he cannot, establish genuine issues of material fact as to whether he was qualified for the position of NYCTA bus driver.

### A

■ In ruling that Shannon's color-blindness rendered him unable to differentiate traffic light colors, the district court relied upon deposition testimony in which Drs. Chung, Nadel, and Margolis opined that Shannon was color-blind and that he should therefore not drive a bus. Shannon challenges the district court's specific ruling that he was unable to distinguish between the colors *used in traffic lights,* arguing that none of the doctors had expressly reported to NYCTA in writing—prior to the filing of this lawsuit—that he was unable to distinguish red, green, or yellow, and that it was error to rely on after-the-fact deposition testimony to support this crucial finding.

■ We disagree. In determining whether a plaintiff has shown that he was "otherwise qualified" under the ADA, a district court must consider the whole record, including testimony from depositions taken after the events that gave rise to suit. Because the doctors' testimony here was based on their analysis of data obtained (from their examinations of Shannon) prior to Shannon's resignation, the testimony is relevant to his ability to distinguish colors at the time he was constructively fired. If he was unable to distinguish colors at that point, it cannot matter that he passed a color vision test sometime earlier, before he was restricted from driving: the "otherwise qualified" inquiry asks whether the plaintiff will be able to do the job. *See Teahan v. Metro-N. Commuter R.R.,* 951 F.2d 511, 521 (2d Cir.1991) ("[W]hether the employee is 'otherwise qualified' as of the date of termination is forward-looking and enables the employer to consider how the employee will perform as compared to non-handicapped individuals.").

The depositions provided sufficient evidence. Dr. Chung testified at deposition that she de-certified Shannon from driving because Dr. Nadel's initial letter and report "indicated [that Shannon] had a definite color deficiency," because Shannon might "not identify [a] traffic light correct-

ly," and because she concluded it was therefore unsafe for him to be driving a bus. Dr. Nadel testified that his recommendation was "based on the fact that [Shannon] had a very distinct color vision abnormality on the Ishihara test and that he has roughly 50 percent normal retinal function of his retinal receptor elements." Most crucially, Dr. Margolis testified that she diagnosed Shannon as having "a red/green deficiency," and that her written report and analysis (which were forwarded to Drs. Nadel and Chung) would have made this fact clear to "[a]ny physician in ophthalmology."

Shannon offered no evidence to the contrary, either by testimony of a medical expert or otherwise; and while Shannon himself asserts that he perceives color truly, he is not really in a position to say. Since there is no evidence that Shannon has or might regain the ability to distinguish the colors of traffic lights, or that NYCTA had reason to think so when Shannon was constructively fired, it is undisputed on this record that he was unable to distinguish the colors of traffic signals at all times relevant to this case.

## B

■ Is the ability to distinguish the colors of traffic signals an essential function of being a bus driver in New York City? Under guidelines accompanying EEOC regulations enacted pursuant to the ADA, courts are instructed to first determine "whether the employer actually require[d] employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. pt. 1630 app. § 1630.2(n). If so, "the inquiry will then center around whether removing the function would fundamentally alter that position." *Id.*

Courts must consider an employer's description of a job's essential functions, in-

cluding pertinent medical standards. *See* 42 U.S.C. § 12111(8); *see also id.* § 12113(a). NYCTA's written employment medical standards ("NYCTA Standards") track the ADA, providing generally that placement of persons with color blindness or impaired color discrimination "should be carefully evaluated," and that

> [c]olor blindness ... or impaired color discrimination must be evaluated in terms of limiting *an individual's ability to perform essential functions of the job* [because s]ome individuals with color blindness are able to perform certain jobs that require visual color discrimination by developing other cues.

(Emphasis added.) The NYCTA Standards further provide, however, that "[f]or bus operators, New York State Article 19–A prevents certification for red, green, and amber color blindness."

It is uncontested that NYCTA required that all bus-driver applicants pass one of two color differentiation tests and be certified by a medical doctor as qualified to drive a bus. As discussed more fully below, a color vision test was required by law, and Shannon himself was given (and passed) such a test before he was hired in early 1999. Moreover, NYCTA adduced evidence that its procedures mandated a further medical examination following accidents. It is undisputed that Shannon's bus was in an accident in May 1999, that he was then examined, and that his driving was restricted following the ensuing color vision differentiation test given by Dr. Chung and the consultants she designated. It is also undisputed that Dr. Chung thereafter refused to certify Shannon as medically qualified to drive.

In other words, it is clear that the NYCTA standards were applied and that the employer considered red-green differentiation and medical certification of this color

vision standard to be essential functions of the NYCTA bus operator job.

Shannon suggests that the ability to distinguish traffic lights may not be technically required under NYCTA Standards, and that elimination of the requirement would not "fundamentally alter" the position of an NYCTA bus driver, *see* 29 C.F.R. pt. 1630 app. § 1630.2(n), because NYCTA standards reference New York law, under which a waiver of the color vision standard is possible for a driver who obtains permission from the United States Department of Transportation's ("USDOT") Federal Highway Administration, *see* 15 N.Y.C.R.R. § 6.10(b)(9)(ii). According to Shannon, the availability of a waiver to some bus drivers means that color vision is not actually essential for any of them.

We conclude that the potentially applicable regulations cited by Shannon are not consistent, binding, or useful. Regulations of the New York State Department of Motor Vehicles ("DMV"), which set vision standards for all bus drivers in the state, provide that a driver must be examined and certified by a physician as "medically qualified" to drive a bus, *id.* § 6.10(h); N.Y.C.L.S. Veh. & Tr. § 509–b(3), and that a driver must:

> ha[ve] distant visual acuity ..., distant binocular acuity ... and *the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber.*

15 N.Y.C.R.R. § 6.10(b)(9)(i) (2002) (emphasis added). As Shannon points out, DMV regulations also contemplate that a bus driver (other than the driver of a school bus) may get a temporary waiver of these DMV vision requirements by obtaining permission from the federal government. *See id.* § 6.10(b)(9)(ii). But the same regulations that contemplate a temporary waiver of the DMV vision standards require that bus drivers be certified by a doctor as medically qualified to drive a bus, generally and specifically with reference to color vision, *id.* § 6.10(h); and it is not clear that a driver with a federal waiver could in any event drive a bus absent a medical certificate attesting that the driver can distinguish the colors of traffic signals.

Even if a color-blind bus driver could find a doctor willing to give the requisite certification, it seems that a waiver might be unavailable from the federal government. USDOT regulations provide that "[a] person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so," 49 C.F.R. § 391.41(a); and they define "Commercial Motor Vehicle" to include any vehicle designed to transport sixteen or more passengers, *id.* § 383.5, and define "physically qualified" to require (*inter alia*) "the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber," *id.* § 391.41(b)(10). It thus seems that the waiver Shannon points to, available under state law but contingent on a federal waiver, is immaterial; federal law seems to provide for no such waiver. We therefore see no inconsistency between the ADA and regulations governing bus driver qualifications. The federal agency that Congress has entrusted with determining minimum guidelines applicable to commercial motor vehicles has determined that the ability to distinguish the colors of traffic lights is essential, and nothing in the ADA calls this judgment into question.

Even if the regulations governing bus drivers permitted a driver who was unable to distinguish between red and green to drive a bus, this alone would not disentitle NYCTA from enforcing a higher standard for its own drivers. *See Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 571, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). Employers formulate jobs to fit the needs of their enterprises, and cannot fill jobs with-

out deciding what attributes are essential to those needs. The essential character of a particular job qualification is therefore a matter of judgment and opinion. No reasonable jury could find that NYCTA exceeded the broad bounds necessarily afforded it under the ADA to decide as an employer whether color vision is an essential qualification for driving a NYCTA bus. NYCTA has a statutory responsibility to operate the transit system "for the safety of the public." *See New York City Transit Auth. v. Transp. Workers Union, Local 100,* 243 A.D.2d 567, 663 N.Y.S.2d 114, 114 (2d Dep't 1997); *see also* N.Y. Pub. Auth. L. § 1204 (describing powers of NYCTA). Employment decisions may be made in light of that public interest. *See New York City Transit Auth. v Transp. Workers Union,* 220 A.D.2d 749, 633 N.Y.S.2d 81, 81 (2d Dep't 1995) ("Requiring [NYCTA] to reinstate an employee who has been found to be a threat to public safety is contrary to public policy and to the petitioner's statutory responsibility to operate the transit system for the safety of the public."). And the medical qualifications at issue were designed to serve that interest. *See* 15 N.Y.C.R.R. § 6.10(h) (stating that "[t]he examining physician should be aware of the rigorous physical demands and mental and emotional responsibilities placed on the driver of a bus," and that requirement of physician certification is imposed "[i]n the interest of public safety").

A NYCTA bus driver guides a vehicle weighing thirteen tons and carrying up to 70 passengers, works eight hour shifts in all kinds of weather, and is required to spot traffic hazards from all directions and from a distance. Color differentiation is a qualification that NYCTA may properly deem essential for driving a bus because it conduces to the safety of passengers and because it serves to limit NYCTA's tort liability in situations where color-blindness might cause an accident as well as where it may be alleged to have done so. *See Stone v. City of Mt. Vernon,* 118 F.3d 92, 97 (1997) (citing 29 C.F.R. § 1630.2(n)(3)(iv) for proposition that a function may be essential because of the "consequences of not requiring [the employee] to perform the function"). No reasonable jury could find otherwise.

### III

■ In addition to his federal law claims, Shannon alleges claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 292, 296, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8–107. Specifically, Shannon argues that under the NYSHRL and NYCHRL, NYCTA had an affirmative duty to accommodate his "regarded as" disability, and that NYCTA failed to do so.

To succeed on his NYSHRL claim, Shannon must have been able to "perform[ ] in a reasonable manner the activities involved in the job or occupation sought or held," N.Y. Exec. Law § 292(21); *see DiSanto v. McGraw–Hill, Inc.,* 220 F.3d 61, 64 (2d Cir.2000); similarly, to prevail on his NYCHRL claim, he must have been able to, "with reasonable accommodation, satisfy the essential requisites of the job ...." N.Y. City Admin. Code § 8–107. We have already held that § 292(21) of the NYSHRL is parallel to the "otherwise qualified" requirement of the ADA. *See DiSanto,* 220 F.3d at 64; *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 n. 1 (2d Cir.2000). We have not had occasion to decide whether the analogous provision of the NYCHRL is also parallel, but we see no reason to think that the NYCHRL and the ADA differ in

this requirement.[2]

Whatever the precise delineation of the NYCHRL, however, Shannon's state law claims are defeated by his inability to comply with federal and state regulations. As discussed above, medical certification is required by regulations governing bus drivers; NYCTA cannot have violated state or local discrimination laws by implementing the state or federal government's requirements for bus driver certification. *See* 49 C.F.R. §§ 391.41(a), 391.41(b)(10) (requiring that bus drivers "recognize the colors of traffic signals and devices showing standard red, green, and amber"); N.Y.C.L.S. Veh. & Tr. § 509–b (*"Notwithstanding any other provision of law,* a person shall be qualified to operate a bus only if such person . . . has passed the bus driver physical examination administered pursuant to regulations established by the commissioner[.]" (emphasis added)). Shannon's inability to distinguish the colors of traffic lights is therefore fatal to all of his claims.

 Even if NYCTA had an affirmative duty to accommodate Shannon's "regarded as" disability, he has failed to identify any reasonable accommodation that NYCTA failed to provide.[3] Shannon has suggested the possibility of reassignment from a bus driver position to a cleaner position. "[R]eassignment to a vacant position" can be a reasonable accommodation in certain circumstances. *See* 42 U.S.C. § 12111(9). Nevertheless, it is not at all clear that the ADA requires reassignment to another job altogether, rather than to a vacant position doing the same job (at other shifts or locations, or in different capacities), *cf. Gilbert,* 949 F.2d at 642 (" '[R]easonable accommodation' does not mean elimination of any of the job's essential functions."); moreover, the position sought must be vacant within a reasonable amount of time, *see* 29 C.F.R.App. § 1630.2(*o*). Whether or not reassignment from driving buses to cleaning them could qualify as an accommodation, the record shows that no cleaner positions were vacant: 6,000 applicants were waiting for a vacancy. Under the ADA, NYCTA had no "affirmative duty to provide [Shannon] with a job for which [ ]he was qualified; [NYCTA] only had an obligation to treat [him] in the same manner that it treated other similarly qualified candidates." *See Wernick v. Fed. Reserve Bank of New York,* 91 F.3d 379, 384–85 (2d Cir.1996) (citing *Sch. Bd. v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). And Shannon has

**2.** We recognize that New York's highest court has interpreted the meaning of "disability" under the NYSHRL to be broader than the meaning of "disabled" under the ADA. *See State Div. of Human Rights v. Xerox Corp.,* 65 N.Y.2d 213, 218–19, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985). *See also Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 155 (2d Cir.1998) ("Regardless of the [fact that the] legislative history of the [NYSHRL] . . . indicat[es] that the statutory definition of disability was intended to be coextensive with that of the federal disability statutes, we are bound by the construction of the statute propounded by the state's highest court.").

**3.** It is not at all clear that a reasonable accommodation can ever be required in a "regarded as" case (such as this one) in which it

is undisputed that the plaintiff was not, in fact, disabled. *See, e.g., Weber v. Strippit, Inc.,* 186 F.3d 907, 917 (8th Cir.1999) (holding that "regarded as" disabled employees are not entitled to reasonable accommodations under the ADA), *cert. denied,* 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000). As the Eighth Circuit observed:

> The ADA cannot reasonably have been intended to create a disparity in treatment among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employees.

*Id.* at 917.

pointed to nothing in the NYSHRL or NYCHRL that imposes any different or more affirmative duty than duties owed under the ADA. Shannon points to isolated bits of legislative history and argues that the State Legislature intended for the NYSHRL to expand the accommodation requirement of the ADA, but we see nothing in the language of the NYSHRL itself that supports this contention. *Compare* 42 U.S.C. § 12112(b)(5)(A) (defining impermissible discrimination as, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee") *with* N.Y. Exec. L. § 296(3)(a) ("It shall be an unlawful discriminatory practice for an employer ... to refuse to provide reasonable accommodations to the known disabilities of an employee . . . .").

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.