Harvey **SIEDERBAUM**, Plaintiff,

v.

The **CITY OF NEW YORK** and the **New York City Transit Authority**, Defendants.

No. 01 Civ. 9289(JGK).

United States District Court, S.D. New York.

March 23, 2004.

Daniel J. Kaiser, Kaiser Saurborn & Mair, P.C., William Heywood Kaiser, 3, Law Office of Michael Lumer, New York City, for Plaintiff.

Joyce Rachel Ellman, NYC, Transportation Authority, Brooklyn, NY, Dorothea W. Regal, Hoguet, Newman & Regal, L.L.P., New York City, for Defendants.

## OPINION and ORDER

KOELTL, District Judge.

The plaintiff, Harvey Siederbaum, brings this employment discrimination action against the New York City Transit Authority ("Transit Authority").[1] The plaintiff alleges that the defendant discriminated against him in violation of the Americans With Disabilities Act ("ADA"). 42 U.S.C. § 12101 *et seq.* The plaintiff suffers from bipolar disorder, which he treats with medication. The plaintiff applied for a position as a bus driver with the Transit Authority, but he was disqualified by the Transit Authority's Medical Standards because he has bipolar disorder. The plaintiff alleges that the Transit Authority's rejection of his application was unlawful discrimination under the ADA because the Transit Authority mistakenly perceived him to be disabled as a result of his bipolar disorder.

The Transit Authority moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the Complaint.

### I

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to

discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits

---

1. By stipulation and order signed by Judge Schwartz, the action was dismissed with prejudice as against the City of New York. (Dkt. No. 6.)

supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998) (collecting cases).

## II

Unless otherwise noted, the following facts are not in dispute. The plaintiff, Harvey Siederbaum, has bipolar disorder, for which he takes lithium. (Def.'s Rule 56.1 St. ¶ 1; Pl.'s Resp. Rule 56.1 St. ¶ 1.) The plaintiff applied for a position as a Bus Operator with the Transit Authority, and in the course of that application the plaintiff submitted to a medical examination by the Transit Authority's Medical Assessment Center. (Def.'s Rule 56.1 St. ¶ 33; Pl.'s Resp. Rule 56.1 St. ¶ 33.) The plaintiff indicated on his employment application that he has bipolar disorder, and that he takes Eskalith, a form of lithium, twice daily to treat the disorder. (Def.'s Rule 56.1 St. ¶ 36–37; Pl.'s Resp. Rule 56.1 St. ¶ 36–37.)

On June 13, 2000, as part of his application for the Bus Operator position, the plaintiff was given a pre-employment medical examination by Dr. Alan Genser, a Transit Authority staff physician. (Def.'s Rule 56.1 St. ¶ 38; Pl.'s Resp. Rule 56.1 St. ¶ 38.) The plaintiff later gave Dr. Genser a note from his personal psychiatrist, Dr. Ira Bergman, that confirmed that the plaintiff had been diagnosed with bipolar disorder and that he was being treated with medication. (Def.'s Rule 56.1 St. ¶ 41; Pl.'s Resp. Rule 56.1 St. ¶ 41.)

Dr. Genser determined that the plaintiff's bipolar disorder disqualified the plaintiff for the position of Bus Operator, because the plaintiff did not meet the Transit Authority's Medical Standards and because he could not be certified as meeting the medical standards for bus drivers under Article 19–A of the New York Vehicle and Traffic Law ("N.Y.V.T.L.").

(Def.'s Rule 56.1 St. ¶ 42; Pl.'s Resp. Rule 56.1 St. ¶ 42.)

New York State motor vehicle regulations, promulgated under Article 19–A of the N.Y.V.T.L., provide that, to be physically qualified to drive a bus, a person must have no "mental, nervous, organic, or functional disease of psychiatric disorder likely to interfere with the ability to control and safely operate a bus." 15 N.Y. Comp.Codes R. & Regs. § 6.10(b)(8). The Transit Authority is required to certify periodically that its Bus Operators meet the specified requirements under the New York State regulations. (Def.'s Rule 56.1 St. ¶ 7; Pl.'s Resp. Rule 56.1 St. ¶ 7.)

The Transit Authority's Medical Standards were developed by the Occupational and Industrial Orthopedic Center of the New York Hospital for Joint Diseases and by Transit Authority medical staff in its Occupational Health Services division. (Def.'s Rule 56.1 St. ¶ 9; Affidavit of Cassandra Clarke–Belgrave, M.D., dated July 31, 2003 ("Clark–Belgrave Aff."), ¶ 5.) Chapter 14 of the Transit Authority Medical Standards addresses mental disorders, and it states that bipolar disorder, whether treated or untreated, is "unacceptable" for "the four public safety-related titles—bus operator, train operator, conductor, and tower operator....." (Transit Authority Medical Standards attached as Ex. B to Clark–Belgrave Aff., at 227.) The Medical Standards further state that bipolar disorder, when "treated and in remission," is "acceptable" for other Transit Authority job titles. (*Id.;* Def.'s Rule 56.1 St. ¶ 14; Pl.'s Resp. Rule 56.1 St. ¶ 14.)

Bipolar disorder, which is also known as manic-depressive disorder, is marked by extreme changes in mood, thought, energy, and behavior. (Def.'s Rule 56.1 St. ¶ 17; Pl.'s Resp. Rule 56.1 St. ¶ 17.) If left untreated, the disorder can severely impair those who suffer from it, causing both

manic and depressive episodes. (Def.'s Rule 56.1 St. ¶¶ 18–20; Pl.'s Resp. Rule 56.1 St. ¶¶ 18–20.) During a depressive episode, a person suffering from bipolar disorder can experience fatigue as well as difficulty in thinking, concentrating, and decision making. (Def.'s Rule 56.1 St. ¶ 19; Pl.'s Resp. Rule 56.1 St. ¶ 19.) During a manic episode, a person can experience distractibility, poor judgment, inflated self-esteem or grandiosity, and flight of ideas, and might engage in imprudent activities, including reckless driving. (Def.'s Rule 56.1 St. ¶¶ 20–21; Pl.'s Resp. Rule 56.1 St. ¶¶ 20–21.)

Lithium is a mood stabilizing agent commonly used to treat bipolar disorder, and it can permit a person to function effectively in that person's life activities, including working. (Def.'s Rule 56.1 St. ¶ 23; Pl.'s Resp. Rule 56.1 St. ¶ 23.) Lithium can cause side effects and toxicity even in amounts at, or slightly above, therapeutic levels. (Def.'s Rule 56.1 St. ¶ 29; Pl.'s Resp. Rule 56.1 St. ¶ 29.) The effects from a toxic reaction to lithium can include, among other things, visual impairment, muscle weakness, muscle twitches, tremors, unsteady gait, confusion, and seizures. (Def.'s Rule 56.1 St. ¶ 31; Pl.'s Resp. Rule 56.1 St. ¶ 31.) In 1988, the plaintiff stopped taking his medication, and as a result the symptoms related to his condition returned and he was hospitalized for a period of time. (Def.'s Rule 56.1 St. ¶ 26; Pl.'s Resp. Rule 56.1 St. ¶ 26.)

The Transit Authority has concluded that the impairments associated with bipolar disorder, whether treated or untreated, pose an unacceptable safety risk in applicants for the positions of Bus Operator, Train Operator, Conductor, and Tower Operator. (Def.'s Rule 56.1 St. ¶¶ 22, 28, 32; Pl.'s Resp. Rule 56.1 St. ¶¶ 22, 28, 32.) These four public safety-sensitive titles at the Transit Authority are positions where employees have a high level of interaction with the general public and are directly responsible for public safety, with minimum direct supervision. (Def.'s Rule 56.1 St. ¶¶ 13; Pl.'s Resp. Rule 56.1 St. ¶¶ 13.) Transit Authority buses range in weight from 13.5 tons to 21 tons, and can carry up to seventy passengers. (Def.'s Rule 56.1 St. ¶ 16; Pl.'s Resp. Rule 56.1 St. ¶ 16.) Bus Operators drive buses through crowded New York streets with minimal direct supervision and must deal with stressful situations, including occasionally belligerent passengers. (Def.'s Rule 56.1 St. ¶ 16; Pl.'s Resp. Rule 56.1 St. ¶ 16.)

When the plaintiff was rejected for the Bus Operator position, someone at the Transit Authority informed the plaintiff that he could apply for other jobs at the Transit Authority, but the plaintiff told that person that he was not interested. (Def.'s Rule 56.1 St. ¶ 5; Pl.'s Resp. Rule 56.1 St. ¶ 5; Siederbaum Dep. at 130–31.) The plaintiff also subsequently applied for a position as a Conductor, but the Transit Authority again determined that he was not qualified for the position, because of his diagnosed bipolar disorder. (Def.'s Rule 56.1 St. ¶¶ 43, 47; Pl.'s Resp. Rule 56.1 St. ¶¶ 43, 47.)

The plaintiff has been continuously employed by the Sanitation Department since 1984. (Def.'s Rule 56.1 St. ¶ 4; Pl.'s Resp. Rule 56.1 St. ¶ 4.) The plaintiff testified that he informed Dr. Genser that his work for the Sanitation Department included a position as a motor vehicle operator, which involved driving people and delivering packages and mail. (Siederbaum Dep. at 100–02.)

### III

The Transit Authority moves for summary judgment on the grounds that the plaintiff cannot make out a prima facie case of discrimination under the ADA. Alternatively, the Transit Authority contends

that it had a legitimate, nondiscriminatory reason for refusing to hire the plaintiff as a bus driver, and that the plaintiff has not shown that this reason was actually a pretext for unlawful discrimination.

An employment discrimination claim brought pursuant to the ADA is governed at the summary judgment stage by the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.1999) (applying *McDonnell Douglas* test to ADA claim). Under the *McDonnell Douglas* test, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas*); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997).

When a plaintiff has successfully demonstrated the elements of a prima facie case, the burden of production shifts to the defendant to put forth a legitimate, nondiscriminatory reason for the employer's challenged action. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089. After the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was. *Id.* at 254–56, 101 S.Ct. 1089; *Fisher*, 114 F.3d at 1336. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Fisher*, 114 F.3d at 1336. The Court of Appeals for the Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir.2000) (quoting *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097). Although summary judgment must be granted with caution in employment discrimination actions "where intent is genuinely in issue, . . . summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers*, 43 F.3d at 40; *Slatky v. Healthfirst, Inc.*, No. 02 Civ. 5182, 2003 WL 22705123, at *4 (S.D.N.Y. Nov. 17, 2003).

### A

 The defendant contends that the plaintiff has failed to make out a prima facie case for discrimination under the ADA. To make out a prima facie case of discrimination based on a disability, the plaintiff must establish that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without a reasonable accommodation; and (4) he was discriminated against because of his disability. *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149–50 (2d Cir. 1998); *see* 42 U.S.C. § 12112(a); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998); *Hawana v. New York City*, 230 F.Supp.2d 518, 530–31 (S.D.N.Y.2002); *Usala v. Consol. Edison Co.*, 141

F.Supp.2d 373, 380 (S.D.N.Y.2001). The defendant first contends that the plaintiff has failed to meet this burden because he has not shown that he is disabled within the meaning of the ADA.

The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The plaintiff identifies his disability as falling under subsection (C), because he alleges that the Transit Authority regarded him as disabled within the meaning of the ADA. The Supreme Court has noted that there are two apparent ways in which individuals may fall within the definition of "disability" in subsection (C): "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

The plaintiff does not contend that his bipolar disorder, when treated with medication, substantially limits any major life activities. Indeed, he concedes that his condition is not a disability within the meaning of the ADA. *See Sutton*, 527 U.S. at 482, 119 S.Ct. 2139 ("[I]t is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act.").

Rather, the plaintiff contends that the Transit Authority mistakenly believed that his bipolar disorder, in its treated and nonlimiting state, was a disability when it refused to hire him as a bus operator. The plaintiff claims to fall under the second of the two scenarios described by *Sutton* in which a person might fall within the "regarded as" definition of disability. Whether a person falls within this definition of disabled "turns on the employer's perception of the employee, a question of intent, not whether the employee has a disability." *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir.1997). The plaintiff is required to allege that "the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis." *Id.* at 285. "It is not enough ... that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA.*" *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir.1998).

Specifically, the plaintiff contends that the Transit Authority mistakenly believed that his bipolar disorder substantially limits him in the major life activity of working. In order to "substantially limit" a major life activity, the disability must either (1) cause the plaintiff to be unable to perform a major life activity that an average person in the general population could perform; or (2) significantly restrict as to the condition, manner or duration under which the plaintiff can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The regulations further provide that with respect to the major life activity of working, the term "substantially limits" means:

> significantly restricted in the ability to perform either a class of jobs or a broad

range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i); *see also Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 82–83 (2d Cir.2000). Factors that may be considered under this standard include the geographical area to which an individual has reasonable access; the number and types of jobs utilizing similar training, knowledge, skills or abilities as the job from which the applicant has been disqualified; and the number and types of jobs not utilizing similar training, knowledge, skills or abilities from which the applicant will also be disqualified. 29 C.F.R. § 1630.2(j)(3)(ii). The Supreme Court concluded in *Sutton* that "[t]o be substantially limited in the major life activity of working ..., one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139.

The plaintiff has not sufficiently established that the Transit Authority regarded him as unable to perform a broad range of jobs. The plaintiff contends that the Transit Authority perceives him to be precluded from any jobs which involve significant interaction with the general public, direct responsibility for public safety, and minimal direct supervision. However, the evidence submitted shows that the Transit Authority considered him excluded from four jobs at the Transit Authority: bus operator, train operator, conductor, and tower operator. Although the plaintiff was also rejected in his application for a position as a train conductor, the plaintiff made it clear at the argument of the current motion that his suit here is based only on his rejection for the position as a bus operator. In any event, the evidence

shows that the Transit Authority regarded the plaintiff as unqualified for the job of bus operator because of his inability to meet the Transit Authority's Medical Standards and, in turn, the certification requirements under Article 19–A of the N.Y.V.T.L. Those standards disqualified him for only four job titles out of all the potential jobs at the Transit Authority. The plaintiff has not established that the Transit Authority regarded him as unable to perform any driving job that does not require driving a bus and that would not require state certification. Indeed, the record establishes that the plaintiff worked as a motor vehicle operator in the Sanitation Department and that he informed the Transit Authority of his experience in jobs that required driving. The evidence also shows that he was invited to apply for other jobs but was not interested in doing so. The evidence in the record establishes that the plaintiff was regarded, at most, as unable to perform only four specialized jobs that involved safety-sensitive positions with limited direct supervision and in which the plaintiff would have direct responsibility for the safety of scores of passengers.

Cases from this Circuit and from the Supreme Court support the conclusion that the plaintiff has not established a prima facie case that he was regarded as disabled by the Transit Authority. In *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999), the Supreme Court affirmed summary judgment and concluded that the United Parcel Service, Inc. ("UPS"), did not regard the plaintiff, a UPS mechanic, as substantially limited in the major life activity of working because he suffered from high blood pressure. *Id.* at 525, 119 S.Ct. 2133. An essential function of a mechanic's job at UPS includes driving commercial motor vehicles. *See id.* at 519, 119 S.Ct. 2133. UPS fired the plaintiff from his mechanic position when it deter-

mined that his blood pressure was too high to satisfy the health requirements imposed by the Department of Transportation ("DOT") for drivers of commercial motor vehicles. *Id.* at 520, 119 S.Ct. 2133. The Court concluded that the evidence showing that UPS regarded the plaintiff as unable to meet the DOT regulations did not itself raise a genuine issue of material fact as to whether the plaintiff was "regarded as unable to perform a class of jobs utilizing his skills." *Id.* at 524, 119 S.Ct. 2133. The Court found that, at most, the plaintiff showed that he was regarded as "unable to perform the job of mechanic only when that job requires driving a commercial motor vehicle." *Id.* Significantly, the Court noted that the applicable regulations defined a "commercial motor vehicle" as a vehicle weighing over 10,000 pounds, designed to carry 16 or more passengers, or used to transport hazardous materials. *Id.* The Court noted that it was undisputed that the plaintiff was generally employable as a mechanic, and concluded that the plaintiff had "put forward no evidence that he is regarded as unable to perform any mechanic job that does not call for driving a commercial motor vehicle and thus does not require DOT certification." *Id.* at 524, 119 S.Ct. 2133.

In *EEOC v. J.B. Hunt Transport, Inc.*, 321 F.3d 69 (2d Cir.2003), the Court of Appeals for the Second Circuit affirmed summary judgment for defendant J.B. Hunt Transport, Inc. ("Hunt"), on the EEOC's claim that Hunt regarded as disabled certain job applicants that Hunt had rejected for over-the-road ("OTR") truck driving positions because the applicants used prescription medicines with potentially harmful side effects. The Court of Appeals concluded that the evidence showed only that "Hunt saw the applicants as unfit to perform a job for which they were

seeking applicants: long-distance, freight-carrying, tractor-trailer driving." *Id.* at 76. That job was neither a "class of jobs" nor a "broad range of jobs," but rather "a specific job with specific requirements." *Id.* at 75. "[T]he fact that one may not be able to perform the specific job of a Hunt OTR driver does not mean that one could not successfully engage in other types of truck driving, let alone in other kinds of safety-sensitive work." *Id.* As with the limitations that the Transit Authority placed on applicants for bus operator positions, the limitation that Hunt placed on applicants for OTR driver was "a limitation on a particular job within a larger group of jobs, and not a substantial limitation on working." *Id.*

Similarly, in *Burton v. Metropolitan Transportation Authority*, 244 F.Supp.2d 252 (S.D.N.Y.2003), the court concluded that the Metropolitan Transportation Authority ("MTA") and the Transit Authority did not regard the plaintiff bus driver as disabled because he used Coumadin, an anticoagulant medication. The court determined that while the defendants perceived the plaintiff to be unable to work as a bus driver, they did not perceive him as substantially limited in his ability to perform the major life activity of working. *Id.* at 259. The court found that the plaintiff was fired because "he could not meet the applicable standards of a bus operator while taking Coumadin." *Id.* at 260. The same conclusion applies here, where the plaintiff was also rejected for a bus driver position because the Transit Authority determined that he would not be able to meet the applicable medical standards for bus drivers.

The plaintiff relies on *Stewart v. New York City Transit Authority*, No. 99 Civ. 1601, 2001 WL 279772 (E.D.N.Y. Feb. 16, 2001).[2] In *Stewart*, the plaintiff claimed

---

**2.** In its reply papers, the defendant forthright-

ly acknowledged that in a recent, unreported

that he was denied a promotion to train conductor because the Transit Authority regarded him as disabled as a result of his status as a recovered substance abuser. The court denied summary judgment for the Transit Authority because the court concluded that "passenger movement positions" make up a broad class of jobs which the plaintiff was perceived to be unable to perform. However, cases decided by the Court of Appeals after *Stewart* suggest that the class of "passenger movement positions" is too narrow for their exclusion to amount to a substantial limitation on the major life activity of working.[3] *See J.B. Hunt,* 321 F.3d at 75 (concluding that driving freight-carrying tractor-trailer trucks over long distances for extended periods of time is "a specific job with specific requirements"); *Giordano v. City Of New York,* 274 F.3d 740, 749 (2d Cir.2001) (finding that serving as full-duty New York City Police Department patrol officer is not broad range of jobs).

The plaintiff also argues that he should have been afforded a more individualized inquiry into whether his bipolar disorder, in its treated and nonlimiting state, disqualified him from the position of Bus Operator. However, the ADA does not prevent the Transit Authority from devising hiring qualifications, including medical standards, that establish physical criteria and that favor certain physical attributes over others, provided that its employment decisions are not made on the basis of physical or mental impairments that are regarded as substantially limiting a major life activity. *See Sutton,* 527 U.S. at 490, 119 S.Ct. 2139. As the Supreme Court explained in *Sutton:* "Standing alone, the allegation that respondent has a vision requirement in place does not establish a claim that respondent regards petitioners as substantially limited in the major life activity of working.... [A]n employer is free to decide that ... some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job." *Sutton,* 527 U.S. at 490–91, 119 S.Ct. 2139. In this case, the plaintiff concedes that his bipolar disorder is not substantially limiting. And as explained above, there is no evidence from which a reasonable jury could conclude that the Transit Authority regarded his bipolar disorder as substantially limiting the major life activity of working.

case, *Bynum v. Metropolitan Transp. Auth.,* No. 01 Civ. 7945 (E.D.N.Y. Sept. 2, 2003), which relies on *Stewart,* the court denied summary judgment for the Transit Authority on the plaintiff's claim that she was regarded as disabled after she was diagnosed with Multiple Sclerosis. The court in *Bynum* concluded that the record established that the Transit Authority viewed the plaintiff "as unable to conduct any work that might lead her into direct contact with the public." *Id.* at 24. There is no evidence in the record in this case that would permit a similar conclusion. Significantly, the court noted that if the Transit Authority, as here, had limited its "perception of [the plaintiff's] working incapacity ... as relating purely to driving a bus," summary judgment might have been granted. *Id.*

3. The court in *Stewart* also emphasized that the other jobs available to the plaintiff at the Transit Authority did not require his specific skills and experience as a driver or conductor. *See Stewart,* 2001 WL 279772, at *5 n. 2. The Court of Appeals has subsequently noted that an employer's inability to offer jobs comparable to the job from which the plaintiff was precluded is not sufficient to establish that the employer perceived the plaintiff to be unable to perform those comparable jobs. *See J.B. Hunt,* 321 F.3d at 76 ("The fact that Hunt did not have another, less demanding driving position to offer the candidates does not indicate that Hunt perceived the candidates as being unqualified for any driving position at all."); *Giordano,* 274 F.3d at 749 n. 5 (concluding that employer's claim that it had no comparable jobs to offer plaintiff "says nothing about the defendants' perception of [the plaintiff's] ability to perform such jobs").

Because the plaintiff has offered no evidence from which a reasonable jury could conclude that the Transit Authority regarded him as disabled within the meaning of the ADA, the defendant's motion for summary judgment must be granted.

### B

■ The defendant further contends that, even if the plaintiff could show that he was regarded by the Transit Authority as disabled within the meaning of the ADA, he cannot establish the third element of a prima facie case of discrimination: that the could perform the essential functions of a bus operator either with or without a reasonable accommodation.

■■ A "qualified person with a disability" is a person with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). EEOC regulations define "essential functions" as the "'fundamental'

duties to be performed in the position in question, but not functions that are merely 'marginal.'" Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir.1997) (citing 29 C.F.R. § 1630.2(n)(1)). In determining whether an individual can perform the essential functions of a job, "a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Shannon v. New York City Transit Authority, 332 F.3d 95, 100 (2d Cir.2003) (internal quotation marks omitted). Employers may use "qualification standards ... that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability," provided that the employers justify the standards as "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation...." 42 U.S.C. § 12113(a); Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 569, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999).[4] The ADA pro-

---

4. Section 12113(b) further provides that an employer may impose as a qualification standard "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). Determining whether an individual poses a "direct threat" to others in the workplace ordinarily requires "an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r). Although the Court of Appeals for the Second Circuit has not directly addressed the issue, persuasive authority suggests that an employer's safety-related qualification standard, when applied across-the-board rather than on an individual basis, need not meet the ADA's "direct threat" standard of individualized assessment. See Albertson's, 527 U.S. at 569 n. 15, 119 S.Ct. 2162 (questioning whether interpretation of ADA that would require all safety-related standards to be evaluated under direct-threat standard, "which might impose a higher burden on employers to justify safety-related qualification standards than other job requirements," is "sound"); Morton v. United

Parcel Serv., Inc., 272 F.3d 1249, 1259 (9th Cir.2001) ("[T]he direct threat defense was meant as a very narrow permission to employers to exclude individuals with disabilities not for reasons related to their performance of their jobs, but because their mere presence could endanger others with whom they work and whom they serve."); EEOC v. Exxon Corp., 203 F.3d 871, 874–75 (5th Cir.2000) (holding that "the direct threat test is not deployed where an employer uses a general safety-based qualification standard across-the-board," but rather "in cases in which an employer responds to an individual employee's supposed risk that is not addressed by an existing qualification standard"). The safety-related qualification imposed by the Transit Authority in this case was imposed across-the-board on all applicants for the position of bus driver. Therefore, the Transit Authority must show that the qualification was job-related and consistent with business necessity; it is not required to engage in an individualized assessment of the plaintiff's ability to perform safely as a bus driver.

vides that the "qualification standards" permitted under § 12113 are an affirmative defense to a charge of disability discrimination; however, courts consider such qualification standards in assessing the plaintiff's prima facie case of discrimination, because an individual with a disability is not "otherwise qualified" for an employment position, within the meaning of § 12111(8), if the individual fails to meet the "qualification standards" permitted under § 12113. *See EEOC v. Amego, Inc.,* 110 F.3d 135, 142–44 (1st Cir.1997); *Brennan v. New York City Police Dep't,* No. 93 Civ. 8461, 1997 WL 811543, at *5 n. 10 (S.D.N.Y. May 27, 1997) (collecting cases), *aff'd,* 141 F.3d 1151 (2d Cir.1998) (table).

In *Shannon,* the Court of Appeals concluded that the ability to distinguish the colors of traffic signals, which is required for bus drivers pursuant to regulations of the New York State Department of Motor Vehicles, is an essential function of being a bus driver in New York City. *See Shannon,* 332 F.3d at 102. The plaintiff in *Shannon* had been forced to resign from his position as a bus driver when the Transit Authority discovered that he was color blind. The Court of Appeals affirmed an order granting summary judgment for the Transit Authority because, even assuming that the plaintiff's color-blindness was a disability because he was allegedly regarded as being substantially limited in the major life activity of working, the plaintiff was not "otherwise qualified" to be a bus driver. *See id.* at 99. In this case, regulations promulgated under Article 19–A of the N.Y.V.T.L. require that bus drivers have no "mental, nervous, organic, or functional disease of psychiatric disorder likely to interfere with the ability to control and safely operate a bus." 15 N.Y. Comp. Codes R. & Regs. § 6.10(b)(8). The Transit Authority, which is required to certify that its bus drivers meet this requirement, has concluded that bipolar disorder, treated or untreated, is a mental disease that is likely to interfere with safe operation of a bus. Therefore, when an individual suffers from bipolar disorder they are unable to perform the essential functions of being a bus driver, because the Transit Authority has determined that it cannot certify that the individual meets the safety requirements promulgated under Article 19–A.

█ In *Shannon,* the Court of Appeals further stated that even if New York regulations permitted color-blind bus drivers, "this alone would not disentitle NYCTA from enforcing a higher standard for its own drivers." *Shannon,* 332 F.3d at 102. The Court of Appeals, citing *Albertson's,* noted that employers must formulate jobs, and determine the necessary attributes of those jobs, based on the needs of their enterprises; therefore, "[t]he essential character of a particular job qualification is ... a matter of judgment and opinion." *Id.* at 102–03. An employer like the Transit Authority must also make employment decisions in light of the fact that it "has a statutory responsibility to operate the transit system for the safety of the public." *Id.* at 103 (internal quotation marks omitted). As in *Shannon,* the medical qualifications at issue in this case were designed to serve that interest, and no reasonable jury could find that the Transit Authority "exceeded the reasonable bounds necessarily afforded it under the ADA to decide as an employer" whether the absence of bipolar disorder is an essential qualification for driving a Transit Authority bus. *Id.* As with the absence of color-blindness, the absence of bipolar disorder "is a qualification that NYCTA may properly deem essential for driving a bus because it conduces to the safety of passengers and because it serves to limit NYCTA's tort liability in situations where [the impairment] might cause an accident

as well as where it may be alleged to have done so." *Id.*

In *Burton,* the court concluded that the plaintiff, who took the anticoagulant medication Coumadin, was not otherwise qualified to drive buses for the Transit Authority because the potential side effects of his medication posed a substantial risk that he could not operate a bus safely, which the court found is an essential function of driving buses. *See Burton,* 244 F.Supp.2d at 263. The court found that both the plaintiff's underlying condition and his treatment regimen of Coumadin posed a risk of hemorrhage and stroke. *See id.* at 260. Because of the condition, the plaintiff was disqualified by the Transit Authority Medical Standards, and the Transit Authority was unable to certify him pursuant to Article 19–A of the N.Y.V.T.L. *See id.* at 261. The court noted that there might be only a small risk that the plaintiff would suffer either a hemorrhage or stroke while driving a bus; however, the court emphasized that "[i]n the bus driving context, a relatively small risk is unreasonable and unacceptable...." *Id.* at 263. Because the plaintiff posed risks to himself and to the public, as well as a risk of "massive liability" for the Transit Authority if any of the risks materialized, the court concluded that the plaintiff could not satisfy the requirements of a position as a bus driver. *See id.* at 262.

Both *Shannon* and *Burton* support the conclusion that the plaintiff is not "otherwise qualified" for a position as a Transit Authority bus driver. When untreated, bipolar disorder can cause those who suffer from it to experience both manic and depressive episodes. During depressive episodes, a person can experience fatigue and can have difficulty concentrating and making decisions. During manic episodes, a person can experience distractibility and poor judgment, and can engage in imprudent activities, including reckless driving.

To prevent the onset of manic and depressive episodes, persons suffering from bipolar disorder are commonly prescribed lithium, a mood-stabilizing agent. But lithium therapy itself presents risks of toxicity and various side effects, which include visual impairment, muscle weakness, twitches, tremors, confusion, and seizures. Moreover, if a person fails to follow the prescribed regimen of lithium, the symptoms associated with bipolar disorder can return. The plaintiff himself was hospitalized in 1988 when he stopped taking his medication and the symptoms of his bipolar disorder returned.

The risks associated with bipolar disorder, whether treated or untreated, however slight the risks might be, support the Transit Authority's conclusion that the absence of bipolar disorder is an essential function of being a bus driver. The Transit Authority must be able to certify that its bus drivers meet the safety requirements imposed by state regulations, and it must abide by its statutory obligation to operate its buses in a way that ensures the "safety of the public." N.Y. Pub. Auth. L. § 1204(15). The Transit Authority also has a substantial and reasonable interest in avoiding the liability that would follow should any of the risks associated with bipolar disorder actually materialize and cause an accident. Transit Authority buses weigh in excess of thirteen tons and carry up to seventy passengers, and "there is probably no more challenging place to drive a bus—without injury to self or others—than New York City." *Burton,* 244 F.Supp.2d at 262. All of these factors counsel in favor of deferring to the Transit Authority's conclusion that the absence of bipolar disorder is an essential function of being a bus driver.

Because no reasonable jury could conclude, based upon the evidence in the record before the Court, that the plaintiff

could perform the essential functions of a bus driver with or without a reasonable accommodation, summary judgment must be granted on that grounds as well.

## CONCLUSION

For the reasons explained above, the defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing the complaint and closing this case.

**SO ORDERED.**